**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ODETTE BLANCO DE FERNANDEZ *née* BLANCO RUTH BLANCO, in her personal capacity, and as Personal Representative of the ESTATE OF ALFREDO BLANCO ROSELL, JR; HEBE BLANCO MIYARES, in her personal capacity, and as Personal Representative of the ESTATE OF BYRON BLANCO ROSELL; SERGIO BLANCO DE LA TORRE, in his personal capacity, and as Personal Representative of the ESTATE OF ENRIQUE BLANCO ROSELL, and Personal Representative of the ESTATE OF FLORENTINO BLANCO ROSELL; LIANA MARIA BLANCO; SUSANNAH VALENTINA BLANCO; LYDIA BLANCO BONAFONTE; JACQUELINE M. DELGADO; BYRON BLANCO, JR.; MAGDELENA BLANCO MONTOTO; FLORENTINO BLANCO DE LA TORRE; JOSEPH E. BUSHMAN; CARLOS BLANCO DE LA TORRE; and GUILLERMO BLANCO DE LA TORRE; | Civil Action No.: 22-CV-6305-LLS-JW<br><br>**AMENDED COMPLAINT** |

Plaintiffs,

v.

MSC MEDITERRANEAN SHIPPING COMPANY SA; and MEDITERRANEAN SHIPPING COMPANY (USA) INC.

Defendants.

Odette Blanco de Fernandez *née* Blanco Rosell ("Odette Blanco Rosell"); Emma Ruth Blanco, in her personal capacity, and as Personal Representative of the Estate of Alfredo Blanco Rosell, Jr; Hebe Blanco Miyares, in her personal capacity, and as Personal Representative of the Estate of Byron Blanco Rosell; Sergio Blanco de la Torre, in his personal capacity, and as Personal Representative of the Estate of Enrique Blanco Rosell, and Personal Representative of the Estate

of Florentino Blanco Rosell; Liana Maria Blanco; Susannah Valentina Blanco; Lydia Blanco Bonafonte; Jacqueline M. Delgado; Byron Diaz Blanco, Jr.; Magdelena Blanco Montoto; Florentino Blanco de la Torre; Joseph E. Bushman; Carlos Blanco de la Torre; and Guillermo Blanco de la Torre ("Plaintiffs"), by and through counsel, as and for their Amended Complaint against MSC Mediterranean Shipping Company SA ("MSC Med") and Mediterranean Shipping Company (USA) Inc. ("MSC USA") ("collectively "Defendants") hereby allege:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action to recover damages and interest under the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, codified at 22 U.S.C. § 6021, *et seq.* (the "Helms-Burton Act" or "Act") against MSC Med and MSC USA for trafficking in property which was confiscated by the Cuban Government on or after January 1, 1959, and as to which Plaintiffs own claims.

2.      On September 29, 1960, the Cuban Government published the announcement of the confiscation without compensation of the following property of Plaintiff Odette Blanco Rosell and her now-deceased siblings:  Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell; and Byron Blanco Rosell (collectively, the "Blanco Rosell Siblings"):

One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.

Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.

Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).

Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

2

Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at 23405 -
23406 (English translation).

3.      The "persons listed in the first Whereas" clause in Resolution No. 436 above is a
reference to the Blanco Rosell Siblings, who were the subject of pretextual "investigations" carried
out by the Cuban Government.   *See id*. at 23405 (first Whereas clause) ("Whereas: Having
considered cases number 3-2-3143, 3-2-8990 and 3-2-9832, regarding the investigations carried
out on the following persons:  Alfredo, Enrique, Florentino, Byron, and Odette Blanco Rosell.").

4.      The Blanco Rosell Siblings' property confiscated by the Cuban Government
included all of their "property and rights, whatever their nature," including but not limited to:

> (a) their wholly owned company, Maritima Mariel SA, and the 70-Year Concession
> held by Maritima Mariel SA, to develop docks, warehouses and port facilities on
> Mariel Bay, a deep water harbor located on the north coast of Cuba; and

> (b) their wholly owned companies, including Compañia Azucarera Mariel S.A. and
> its extensive land holdings (approximately 11,000 acres) on the southeast, south
> and west sides of Mariel Bay, which included a number of improvements such as
> roads, railways, buildings, and utilities

*See* Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at
23406 (English translation) ("Confiscated Property").

5.      The Blanco Rosell Siblings were not U.S. citizens when the Cuban Government
confiscated their Confiscated Property in 1960.  They fled Cuba after the confiscation and became
U.S. citizens before March 12, 1996, the date the Helms-Burton Act was signed into law.  The
Blanco Rosell Siblings were not eligible to, and therefore did not file claims with the Foreign
Claims Settlement Commission ("FCSC") under Title V of the International Claims Settlement
Act of 1949.  No claims relating to the Confiscated Property have been filed with the FCSC and
the Confiscated Property is not the subject of any FCSC certified claims.  Of the Blanco Rosell
Siblings, today only Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, age 92, is alive.

6.      In 1996, the U.S. Congress passed the Helms-Burton Act, and President William J. Clinton signed the Act into law on March 12, 1996.  Title III of the Act, which took effect in August 1996, imposes liability against persons who "traffic" in property confiscated by the Cuban Government on or after January 1, 1959, the claims to which are owned by persons who became U.S. nationals after the confiscation of their property and before March 12, 1996.

7.      Although Title III's creation of liability as to those engaged in trafficking has remained in force since August 1996, the ability of any potential plaintiff to bring a private right of action for Title III violations had been suspended by several Presidents (pursuant to authority granted in the Act) until May 2019, when President Donald Trump allowed the suspension of Title III's private right of action to lapse, thereby allowing such actions to proceed.

8.      The 2-year waiting period that began on the date of the enactment of the Act and which is applicable to United States nationals with claims not certified by the FCSC has long since passed.

## PARTIES

### I.      Plaintiffs

9.      Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She acquired ownership of her claim to the Confiscated Property before March 12, 1996, which claim she still owns.  She became a naturalized U.S. citizen on September 8, 1971.  She resides in Miami-Dade County, Florida.

10.     Alfredo Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Emma Ruth Blanco, in her capacity as Personal Representative of Alfredo Blanco Rosell's estate. The Circuit Court for Miami-Dade County, Florida, Probate Division, has opened Alfredo Blanco Rosell's estate, appointed Emma Ruth Blanco as Personal Representative, and issued Letters of

Administration for, *inter alia,* the purpose of Emma Ruth Blanco suing to recover for Alfredo Blanco Rosell's claim to the Confiscated Property. *In re Estate of Alfredo, deceased*, Case No. 2020-005105-CP-02, Section PMH03 (J. Soto). Alfredo Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A). He became a naturalized U.S. citizen on August 26, 1970. He acquired ownership of his claim to the Confiscated Property before March 12, 1996. Prior to his death on December 10, 2006, he resided in Miami-Dade County, Florida.

11.     Byron Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Hebe Blanco Miyares, in her capacity as Personal Representative of Byron Blanco Rosell's estate. The Circuit Court for Miami-Dade County, Florida, Probate Division, has re-opened Byron Blanco Rosell's estate, appointed Hebe Blanco Miyares as Personal Representative, and issued Letters of Administration for the purpose of Hebe Blanco Miyares' suing to recover for Byron Blanco Rosell's claim to the Confiscated Property. *In re Estate of Byron Blanco, deceased*, Case No. 2001-002462-CP-02, Section PMH03 (J. Soto). Byron Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A). He became a naturalized U.S. citizen on April 21, 1966. He acquired ownership of his claim to the Confiscated Property before March 12, 1996. Prior to his death on February 25, 2001, he resided in Miami-Dade County, Florida.

12.     Enrique Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Sergio Blanco de la Torre ("Sergio Blanco"), in his capacity as Personal Representative of Enrique Blanco Rosell's estate. The Circuit Court for Miami-Dade County, Florida, Probate Division, has opened Enrique Blanco Rosell's estate and appointed Sergio Blanco as Personal Representative for the purpose of Sergio Blanco suing to recover for Enrique Blanco Rosell's claim to the Confiscated Property. *In re: Blanco, Enrique, Decedent*, Case No. 2021-000187-CP-02, Section PMH03 (J. Soto). Enrique Blanco Rosell was a United States national within the

meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on September 23, 1970.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.  Prior to his death on November 27, 2014, his last known place of residence was San Juan, Puerto Rico.

13.    Florentino Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Sergio Blanco de la Torre, in his capacity as Personal Representative of Florentino Blanco Rosell's estate.  The Circuit Court for Miami-Dade County, Florida, Probate Division, has opened Florentino Blanco Rosell's estate and appointed Sergio Blanco de la Torre as Personal Representative for the purpose of suing for Florentino Blanco Rosell's claim to the Confiscated Property.  *In re: Blanco, Florentino Decedent*, Case No. 2021-000131-CP-02, Section PMH03 (J. Soto).  Florentino Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in or around 1975.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.   Prior to his death on March 18, 2005, his last known place of residence was Baldrich, Puerto Rico.

14.    Plaintiff Emma Ruth Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco Rosell's claim does not remain his property, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on January 4, 1973.  She resides in Miami-Dade County, Florida.

15.    Plaintiff Liana Maria Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco Rosell's claim does not remain his property, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen prior to March 12, 1996.  She resides in Miami-Dade County, Florida.

16.     Plaintiff Susannah Valentina Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's granddaughter.  To the extent that Alfredo Blanco Rosell's claim does not remain his property, she inherited and owns a portion of that claim.  She was a U.S. citizen prior to March 12, 1996.  She resides in Miami-Dade County, Florida.

17.     Plaintiff Hebe Blanco Miyares is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Byron Blanco Rosell's daughter.  To the extent that Byron Blanco Rosell's claim does not remain his property, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on September 23, 1970.  She resides in Miami-Dade County, Florida.

18.     Plaintiff Lydia Blanco Bonafonte is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Byron Blanco Rosell's daughter.  To the extent that Byron Blanco Rosell's claim does not remain his property, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on November 17, 1971.  She resides in Miami-Dade County, Florida.

19.     Plaintiff Jacqueline M. Delgado is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Byron Blanco Rosell's daughter.  To the extent that Byron Blanco Rosell's claim does not remain his property, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on February 18, 1970.  She resides in Miami-Dade County, Florida.

20.     Plaintiff Byron Blanco, Jr. is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Byron Blanco Rosell's son.  To the extent that Byron Blanco Rosell's claim does not remain his property, Byron Blanco, Jr. inherited and owns a portion of that claim.

He became a naturalized U.S. citizen before March 12, 1996. He resides in Orange County, California.

21.     Plaintiff Magdelena Blanco Montoto is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Florentino Blanco Rosell's daughter. To the extent that Florentino Blanco Rosell's claim does not remain his property, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on June 21, 1977. She resides in Miami-Dade County, Florida.

22.     Plaintiff Sergio Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). He is Florentino Blanco Rosell's son and Enrique Blanco Rosell's nephew. To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns a portion of that claim. In addition, to the extent Enrique Blanco Rosell's claim does not remain his property, Sergio Blanco inherited and owns all of that claim. He became a naturalized U.S. citizen on January 25, 1983. He resides in Guaynabo, Puerto Rico.

23.     Plaintiff Florentino Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). He is Florentino Blanco Rosell's son. To the extent that Florentino Blanco Rosell's claim does not remain his property, Florentino Blanco de la Torre inherited and owns a portion of that claim. He became a naturalized U.S. citizen on February 1, 1978. He resides in Gauynabo, Puerto Rico.

24.     Plaintiff Joseph E. Bushman is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). He is the surviving husband of Florentino Blanco Rosell's daughter, Maria Elena Blanco. To the extent that Florentino Blanco Rosell's claim does not remain his property, Joseph E. Bushman inherited and owns a portion of that claim. He was born a U.S. citizen on

March 14, 1947 and has remained a U.S. citizen his entire life.  He resides in Sumter County, Florida.

25.     Plaintiff Carlos Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain his property, Carlos Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on February 26, 1985.  He resides in Gauynabo, Puerto Rico.

26.     Plaintiff Guillermo Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain his property, Guillermo Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on August 3, 1982.  He resides in San Juan, Puerto Rico.

## II.     Defendants

27.     Defendant MSC Mediterranean Shipping Company, S.A. ("MSC Med") is a Société Anonyme organized under the laws of Switzerland with its principal place of business located at Chemin Rieu 12-14, 1208 Geneva, Switzerland.

28.     MSC Med describes itself as a "world leader in container shipping."[1] MSC Med states that its "global network of more than 600 local offices in 155 countries enables [it] to facilitate international trade between the world's major economies, and among emerging markets across all continents."[2]

29.     MSC Med is the largest container shipping company in the world.

---

[1] https://www.msc.com/en/about-us/msc-group (last visited May 26, 2022).

[2] https://www.msc.com/che/about-us (last visited May 26, 2022).

30.    Defendant Mediterranean Shipping Company (USA) Inc. ("MSC USA") is a corporation organized and existing pursuant to the laws of the State of New York with its primary place of business located at 420 Fifth Avenue, 8th Floor, New York New York 10018.

31.    At all relevant times, MSC USA is and has been MSC Med's general agent for shipments from the United States.  MSC Med's United States Terms and Conditions (the "US T&Cs") confirms that MSC Med's "General Agent" in the United States is MSC USA. *See* Exhibit A.

32.    In the US T&Cs, which are published in English and publicly available on MSC Med's website, MSC Med states: "All cargo booked by MSC USA is ***for and on behalf of*** MSC Mediterranean Shipping Company S.A., Geneva, who is the Carrier, and any reference to MSC herein shall include MSC USA."  Exhibit A at § 2.1 (emphasis added).

### III.    Relevant Non-Parties

33.    Terminal de Contenedores del Mariel ("TCM") is a 100% Cuban state-owned entity.  TCM operates a container terminal at the Port of Mariel.  The container terminal as defined in TCM's contracts with its customers—including, upon information and belief, TCM's contract with MSC Med—consists of various facilities, equipment, and land, including but not limited to: (i) the container terminal's headquarters, (ii) multiple container storage yards, (iii) other premises used to provide container terminal services under the contracts, as well as (iv) vacant land to be developed to provide container terminal services  ("Container Terminal").  TCM is an agency or instrumentality of the Cuba Government.  As discussed more fully below in § XII.B., at all relevant times, TCM trafficked in—and continues to traffic in—the Confiscated Property.

34.    TCM displays MSC as one of its "nuestros clientes" on TCM's main website's landing page, available at https://www.tcmariel.cu/ (last visited July 25, 2022); *see also* https://www.tcmariel.cu/?lang+en (last visited July 25, 2022) (in English "our customers").

**NUESTROS CLIENTES**

     

35.  Non-party Almacenes Universales S.A. (also known as "AUSA") is a 100% Cuban state-owned entity that is a comprehensive logistics operator that, *inter alia,* runs the CARILOG logistics facility built on Confiscated Property adjacent to the Container Terminal ("Logistics Facility").  AUSA is a subsidiary of Grupo de Administración Empresarial SA (or GAESA), an umbrella group controlled by the Cuban military.  On November 9, 2017, the U.S. State Department listed GAESA, AUSA, and the TCM as Restricted Entities and Subentities Associated with Cuba.  *See* The State Department's List of Entities and Subentities Associated with Cuba (Cuba Restricted List), 82 Fed. Reg. 52089 (Nov. 9, 2017).  AUSA is an agency or instrumentality of the Cuba Government.  As discussed more fully below in § XII.B., at all relevant times, AUSA trafficked in—and continues to traffic in—the Confiscated Property.

36.  In December 2020, the U.S. Treasury Department added GAESA to its "Specially Designated Nationals and Blocked Persons" list, barring American individuals and companies from doing business with the company.  *See* Notice of OFAC Sanctions Action, 85 Fed. Reg. 84468 (Dec. 28, 2020).

37.  Agencia Maritima Mapor S.A. ("Mapor Habana") is Defendants' Cuban agent and is located at Edificio Beijing Oficina No. 116, Avenida 3ra entre 76 y 68, Miramar Playa, Ciudad de la Habana, Cuba.  At all relevant times, Mapor Habana trafficked in—and continues to traffic in—the Confiscated Property.

## JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, specifically Title III of the Helms-Burton Act, 22 U.S.C. §§ 6081–85.

39.    The amount in controversy in this action exceeds $50,000, exclusive of interest, treble damages, court costs, and reasonable attorneys' fees.  22 U.S.C. § 6082(b).

40.    Defendant MSC USA is subject to the personal jurisdiction of this Court because it is a corporation organized and existing pursuant to the laws of the State of New York with its primary place of business located in this District.

41.    Defendant MSC Med is subject to the personal jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and pursuant to N.Y. C.P.L.R. § 302(a) because, *inter alia,* MSC Med has both directly as the disclosed principal and carrier on its bills of lading and through its agent MSC USA (a) engaged in substantial and not isolated activity within this State; (b) committed and continues to commit acts of trafficking as defined in the Helms Burton Act, 22 U.S.C. § 6023(13) within the state of New York and within this judicial District and thus is subject to personal jurisdiction in the state courts of New York and in this Court; and (c) transacts business in New York and contracts to supply goods and services in New York, including the business of contracting to and carrying containers from New York to the Port of Mariel (that is, MSC Med transacts business in New York and the claim asserted in this case arises from that business activity).

42.    At all relevant times, New York law permitted the exercise of jurisdiction over any party who in person "or through an agent" engaged in the acts of trafficking described herein.

43.    In the alternative, to the extent Defendant MSC Med is not subject to jurisdiction in any state, personal jurisdiction is conferred upon this Court over that Defendant by Federal Rule

of Civil Procedure 4(k)(2), because Plaintiffs' Helms-Burton Act claim arises under federal law; Defendant MSC Med is not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction over Defendant MSC Med based on its nationwide contacts is consistent with the U.S. Constitution and laws because (i) MSC Med has purposefully availed itself of the benefits and protections of the United States, and this action arises from or relates to such contacts and purposeful availment, and/or (ii) MSC Med has committed intentional torts purposefully directed at U.S. nationals in the United States which caused harm that MSC Med knew or reasonably should have anticipated would be suffered in the United States by certain U.S. nationals.

44.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred in this District.

45.     Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants reside or are deemed to reside in the Southern District of New York under 28 U.S.C. §§ 1391(c) and (d).

46.     Contemporaneous with the filing of the Complaint, Plaintiffs paid the special fee for filing an action under Title III of the Helms-Burton Act, 22 U.S.C. § 6082(i).

### ADDITIONAL JURISDICTIONAL ALLEGATIONS

**IV.    MSC Med is subject to jurisdiction under FRCP 4(k)(1)(A) and N.Y. C.P.L.R. § 302(a).**

47.     MSC Med, directly and through its agent MSC USA, has numerous business operations in New York. MSC Med operates its fleet of vessels, including its vessels operating from the Port of New York, directly as the carrier and disclosed principal on its bills of lading.

48.     When MSC Med's vessels arrive at and depart from the Port of New York, they dock and utilize wharf space; offload and/or load containers; hook up to water and electricity, and

utilize crane service, container storage yards, logistics facilities, warehouses and other storage space to store the containers, as well as road, rail and wheeled means of conveyance for the containers it unloads ("Port Services"). MSC Med uses these same Port Services at the Port of Mariel.

49.    In addition to operating at the Port of New York, MSC Med and its agent MSC USA operate by road, rail, and barge to provide door-to-door services for its customers. MSC Med describes this intermodal transportation as "a core focus for MSC." MSC Med and its agent MSC USA also offer warehouse and storage solutions and provide "comprehensive picking/packing, unloading, labelling, palletisation and bulk stacking."

50.    MSC USA is, and has been, MSC Med's local agent with respect to the shipments at issue. According to bills of lading on file with U.S. Customs and Border Protection, since 2016, MSC Med contracted to serve as the carrier for approximately 273 cargo shipments from various U.S. Ports, including multiple cargo shipments from the Port of New York (within this District) to the Port of Mariel.

51.    MSC Med was identified as the disclosed principal and MSC USA as MSC Med's agent on every contract of carriage/bill of lading/waybill for containers shipped from the United States, including from the Port of New York to the Port of Mariel.

52.    MSC Med's contracts of carriage, called "waybills" or "bills of lading," all contain the same or similar material provisions and are "[s]igned by MSC (USA) Inc. as Agent on behalf of the Carrier MSC Mediterranean Shipping Company S.A." or words to that effect. *See also* 2017 Declaration of Paolo Magnani, Executive Vice President for MSC USA filed in *In re M/V MSC Flaminia*, 1:12-cv-0892-GBD-SLC, Dkt. No. 975 (S.D.N.Y.) (including 8 exhibits stating that "MSC (USA) is the United States agent of Claimant/Defendant MSC Mediterranean Shipping

Company, S.A." and explaining, *i.a.*, that "[t]he physical documents [whether bills of lading or waybills] in all cases consist of a front page on which information unique to the shipment is provided, *e.g.*, the description of the cargo, and a reverse side containing the applicable terms and conditions" and including examples).

53.     In this District where Defendants do business, MSC USA (in person) and MSC Med (either in person or through its agent MSC USA) engaged in the following activities to facilitate shipments to the Port of Mariel:

a.     Gathered information from the shippers about the shipments to Cuba.

b.     Chose the Port of Mariel in Cuba as the destination port in Cuba for the shipments despite the availability of equally suitable ports in Cuba.

c.     Sent booking confirmations to the shippers.

d.     Provided empty containers to the shippers, which containers are owned by MSC Med or its agent MSC USA.

e.     Loaded the filled MSC Med containers at the Port of New York onto the MSC Med vessels for delivery to Cuba.

f.     Issued bills of lading and/or sea waybills to the shipper for their shipment to Cuba.

g.     Directed the vessels to the Port of Mariel.

h.     Launched the cargo from New York with the destination port being the Port of Mariel.

i.     Carried the cargo departing from the Port of New York and going to the Port of Mariel.

54.     Between 2016 and 2021, MSC Med carried at least five such shipments from the Port of New York to the Port of Mariel.  As explained below, these shipments use and benefit from Plaintiffs' Confiscated Property.  The benefit that MSC Med and MSC USA obtain by using Plaintiffs' Confiscated Property in Cuba arises directly out of their ability to operate their commercial business in New York for their customers that seek to ship their goods from New York to Cuba.  MSC Med's customers pay MSC Med and MSC USA for this service.

55.     MSC Med also actively promotes its shipping services to customers in this District through a fully interactive website with robust internet e-business capabilities.  New Yorkers can readily access the website and book MSC Med's services which, at all relevant times, included services to Cuba.

56.     Among other things, customers in New York can do the following through the website: (i) enter into binding contracts with MSC Med for shipment of containers from New York to the final destination in Cuba; (ii) search shipping schedules, log into personalized accounts, get quotes, manage documents, book shipments, and track shipments, among other services; and (iii) manage every aspect of a shipment from booking to delivery directly on MSC Med's website, without any "need to pick up the phone."

57.     On information and belief, when offering its services to Cuba, MSC Med's website offered door-to-door solutions, including inland haulage and storage in Cuba. MSC Med promises delivery "to your customer's door," including in Cuba.  Its website informs its customers and potential customers in New York that they can "Simply tell us what you're shipping and where it needs to go, and we'll take care of the rest – providing regular updates and customer support at every step."

58.     MSC Med also advertises on its website to its customers and potential customers that they can book MSC Med's warehousing and storage solutions "through our global network of storage facilities."   MSC Med used warehousing and storage solutions in Cuba.

59.     New York residents could – and on information and belief did – use MSC Med's website to obtain quotes for shipments to Cuba, book shipments to Cuba, track shipments to Cuba, enter into contractual agreements with MSC Med for their shipments to Cuba, and/or obtain bills of lading and other transportation documents from MSC Med for their shipments to Cuba.

60.     After reaching into New York and communicating these materials to MSC Med's customers and potential customers, MSC Med then profits from the web traffic generated by those communications and the resulting online reservations booked and contractual agreements entered into by its customers for the door-to-door shipping solutions, whether by road, rail, or barge.

61.     MSC Med and MSC USA profit by, from and through carrying the cargo to the Port of Mariel, using road and rail to transport their cargo at the Port of Mariel, storing the cargo at the Port of Mariel, and arranging logistics at the Port of Mariel for the delivery of that cargo inland from the Port of Mariel to the final destination in Cuba.

62.     MSC Med's and MSC USA's shipping business to the Port of Mariel would not be possible or profitable without the ability to use and benefit from all of the port services and facilities at the Ports of New York and Mariel.  That use of the port facilities includes the use and availability of all the physical areas and services offered at the Port of New York and at TCM's Container Terminal in the Port of Mariel.

**V.      MSC Med is subject to jurisdiction under FRCP 4(k)(2).**

63.      MSC Med also purposefully directs substantial commercial activities and other contacts at the United States, including additional shipment of cargo from other U.S. ports to the Port of Mariel, which shipments also constitute trafficking in Plaintiffs' Confiscated Property.

64.      In this District and throughout the United States where Defendants do business, MSC USA (in person) and MSC Med (either in person or through its agent MSC USA) engaged in the following activities to facilitate shipments to the Port of Mariel:

a.      Gathered information from the shippers about the shipments to Cuba.

b.      Chose the Port of Mariel in Cuba as the destination port in Cuba for the shipments despite the availability of equally suitable ports in Cuba.

c.      Sent booking confirmations to the shippers.

d.      Provided empty containers to the shippers, which containers are owned by MSC Med or its agent MSC USA.

e.      Loaded the filled MSC Med containers at the port of origin in the United States onto the MSC Med vessels for delivery to Cuba.

f.      Issued bills of lading and/or sea waybills to the shipper for their shipment to Cuba.

g.      Directed the vessels to the Port of Mariel.

h.      Launched the cargo from port of origin in the United States with the destination port being the Port of Mariel.

i.      Carried the cargo departing from the Port of New York and going to the Port of Mariel.

65.      MSC Med also actively promotes its shipping services to customers throughout the United States through a fully interactive website with robust internet e-business capabilities.

Anyone in the United States can readily access the website and book MSC Med's services which, at all relevant times, included services to Cuba.

66.     Among other things, customers in the United States can do the following through the website: (i) enter into binding contracts with MSC Med for shipment of containers from ports in the United States to the final destination in Cuba; (ii) search shipping schedules, log into personalized accounts, get quotes, manage documents, book shipments, and track shipments, among other services; and (iii) manage every aspect of a shipment from booking to delivery directly on MSC Med's website, without any "need to pick up the phone."

67.     On information and belief, when offering its services to Cuba, MSC Med's website offered door-to-door solutions, including inland haulage and storage in Cuba. MSC Med promises delivery "to your customer's door," including in Cuba. Its website informs its customers and potential customers throughout the United States that they can "Simply tell us what you're shipping and where it needs to go, and we'll take care of the rest – providing regular updates and customer support at every step."

68.     MSC Med also advertises on its website to its customers and potential customers that they can book MSC Med's warehousing and storage solutions "through our global network of storage facilities." MSC Med used warehousing and storage solutions in Cuba.

69.     Customers in the United States could – and on information and belief did – use MSC Med's website to obtain quotes for shipments to Cuba, book shipments to Cuba, track shipments to Cuba, enter into contractual agreements with MSC Med for their shipments to Cuba, and/or obtain bills of lading and other transportation documents from MSC Med for their shipments to Cuba.

70.    After reaching into the United States and communicating these materials to MSC Med's customers and potential customers, MSC Med then profits from the web traffic generated by those communications and the resulting online reservations booked and contractual agreements entered into by its customers for the door-to-door shipping solutions, whether by road, rail, or barge.

71.    MSC Med has more than 110,000 employees—including over 1,000 at nine offices in the United States—and 700 vessels covering 500 ports of call.  According to its website, MSC Med operates at 21 ports and 31 terminals in the United States.[3] It also leases land in the United States.  As the following map illustrates, MSC Med operates in nearly every single U.S. state that touches the Atlantic Ocean, Pacific Ocean, or Gulf of Mexico:



_____

[3] https://www.msc.com/en/local-information/america/united-states#Overview (last visited July 6, 2022).

72.    "Once the shipper delivers the shipment to the designated place of receipt, MSC [Med] takes physical control of the container and assumes responsibility for the goods. The details of the goods in the container are contained in the contract of carriage, known as a bill of lading or a sea waybill, and it will list the port of loading, the port of discharge, the places of receipt and delivery for the shipment (if those differ from the ports of loading or discharge), a description of the goods, and details about the shipper and other parties involved in the shipment." Dkt. 25 at ¶ 13.

73.    MSC Med carries the containers (owned either by MSC Med or MSC USA) to ports in Panama, the Bahamas, and the Dominican Republic where the containers are off-loaded and then loaded onto other ships (a/k/a "commercial feeder" ships) contracted by or otherwise engaged by MSC Med and are then carried by MSC Med to the Port of Mariel.

74.    MSC Med has carried nearly 300 shipments from various U.S. ports to the Port of Mariel. MSC Med is actively involved in each stage of these shipments from the U.S. to the Port of Mariel and delivery to inland Cuba, and profits from them, even as these goods often are transferred from an MSC Med vessel to a ship operated by a different company at intermediatory points in the Caribbean en route to their port of discharge at the Port of Mariel where they are delivered to MSC Med's agent, Mapor Habana. Defendants, either directly or through their agents, then arrange for delivery to their destination inland in Cuba

75.    The nearly 300 shipments use and benefit from the same Port Services at the relevant U.S. ports and at the Port of Mariel. As explained below, these shipments use and benefit from Plaintiffs' Confiscated Property. The benefit that MSC Med and MSC USA obtain by using Plaintiffs' Confiscated Property in Cuba arises directly out of their ability to operate their

commercial business in the United States for their customers that seek to ship their goods from the United States to Cuba.  MSC Med's customers pay MSC Med and MSC USA for this service.

76.     Despite its national presence, MSC Med routinely chooses to litigate disputes in this District.  It requires customers to sign ocean carrier agreements—more commonly known as "waybills" or "bills of lading"—that include various terms and conditions (the "Waybill T&Cs") requiring customers to, *inter alia*, agree to bring any suit relating to any shipments to or from the United States exclusively in the United States District Court for the Southern District of New York.  *See* Waybill T&Cs attached as Exhibit B (identifying the "Terms and conditions of MSC Mediterranean Shipping Company S.A.").  For example, one lawsuit it filed in this District alleged jurisdiction over MSC Med and the defendants by virtue of the Waybill T&Cs.  *See MSC Mediterranean Shipping Company S.A. v. One Banana North America Corp*., Case No. 1:22-cv-05425, Doc. No. 1 at ¶¶ 13-14 (S.D.N.Y. June 27, 2022) (the "One Banana Case").

77.     In the One Banana Case, MSC Med outlined the five-step "procedure for booking a shipment with MSC."  *Id*. at ¶ 21.  The first step is: "a shipper contacts MSC via its local agent to provide the basic information . . . ."  *Id*.  The remaining four steps show how involved MSC Med is in the booking process.  MSC Med decides whether to accept the booking.  MSC Med supplies MSC Med's "empty MSC container" to the shipper.  MSC Med "instruct[s] the terminal at the load port to stow the container aboard the vessel."  MSC Med "issue[s] a bill of lading or sea waybill to the shipper, which sets forth the terms and conditions that will govern the shipment."  *Id*.

## THE HELMS-BURTON ACT

### VI.    Background

78.     The Helms-Burton Act, signed into law on March 12, 1996, has several goals, including to "protect United States nationals against confiscatory takings and the wrongful

trafficking in property confiscated by the Castro regime." 22 U.S.C. § 6022(6).  Further, Congress determined that "'trafficking' in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise to the … Cuban Government and thus undermines the foreign policy of the United States," which foreign policy includes "protect[ing] claims of United States nationals who had property wrongfully confiscated by the Cuban Government." 22 U.S.C. § 6081(6).

79.    Congress found that international law "lacks fully effective remedies" for the "unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property." 22 U.S.C. § 6081(8).

80.    Congress thus decided that "the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11).  The result was Title III of the Helms-Burton Act – "Protection of Property Rights of United States Nationals" – which imposes liability on persons trafficking in property confiscated from a U.S. national (including property confiscated from a person who became a U.S. national before March 12, 1996) by the Cuban Government on or after January 1, 1959, and which authorizes a private right of action for damages against such traffickers.  *See* 22 U.S.C. § 6082.

81.    The Helms-Burton Act authorizes the President (or his delegate, the Secretary of State) to suspend for periods of up to six months at a time (1) the Title III private right of action, 22 U.S.C. § 6085(c); and/or (2) the effective date of Title III of August 1, 1996, 22 U.S.C. § 6085(b).

82.    On July 16, 1996, President Clinton announced that after the Helms-Burton Act came into effect on August 1, 1996, he was suspending the private right of action under Title III

for six months.  The August 1, 1996 effective date was never suspended. Starting on that date, traffickers in confiscated property were liable to U.S. nationals with claims to that property but could not be sued while the private right of action remained suspended.

83.     President Clinton and subsequent administrations renewed the suspension of the Title III private right of action, typically for six months at a time, by decision of the President or the Secretary of State.  There was never any guarantee that additional suspensions of the private right of action would be granted indefinitely into the future, and the operative provisions of the Act have remained in effect continuously since 1996.

84.     On April 17, 2019, Secretary of State Pompeo announced that the Trump Administration would no longer suspend the right to bring an action under Title III, effective May 2, 2019.  On May 2, 2019, upon the expiration of the last suspension, the right to bring an action under Title III was activated.

## VII.    The Helms-Burton Act's Private Right of Action

85.     Title III of the Helms-Burton Act provides the following private right of action:

(1) Liability for trafficking. — (A) Except as otherwise provided in this section, any person that, after the end of the 3-month period  beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages...

22 U.S.C. § 6082(a)(1).

86.     The Act defines "person" as "any person or entity, including any agency or instrumentality of a foreign state." 22 U.S.C. § 6023(11).

87.     The Act defines "United States national" to include "any United States citizen or any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States."  22 U.S.C. § 6023(15).

88.     The Act adopts the definition of "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b), *see* 22 U.S.C. § 6023(1) ("Agency or Instrumentality of a Foreign State.— The term "agency or instrumentality of a foreign state" has the meaning given that term in section 1603(b) of title 28, United States Code.").

89.     A person "traffics" in confiscated property if that person "knowingly and intentionally":

(i)     sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii)    engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii)   causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13).

90.     The Act defines "property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." 22 U.S.C. § 6023(12).

91.     The Act defines "confiscated" in relevant part as:

[T]he nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959 —

> > (i)    without the property having been returned or adequate and effective compensation provided; or
>
> > (ii)   without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure.

22 U.S.C. § 6023(4)(A).

92.    The term "knowingly" under the Act means "with knowledge or having reason to know."  22 U.S.C. § 6023(9).

93.    The Helms-Burton Act adopts the definition of "commercial activity" under 28 U.S.C. § 1603(d), *see* 22 U.S.C. § 6023(3), which defines the term as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).

94.    Under the Act,

(A)  The term "Cuban Government" includes the government of any political subdivision of Cuba, and any agency or instrumentality of the Government of Cuba.

(B)  For purposes of subparagraph (A), the term "agency or instrumentality of the Government of Cuba" means an agency or instrumentality of a foreign state as defined in section 1603(b) of title 28, United States Code, with each reference in such section to "a foreign State" deemed to be a reference to "Cuba."

22 U.S.C. § 6023(5).

95.    Since August 1, 1996, when Title III of the Helms-Burton Act went into effect, it has been clear that companies doing business with Cuba or in Cuba incurred potential liability under the Helms-Burton Act if they knowingly and intentionally traffic in confiscated property.

96.     Companies doing business in and/or with Cuba have therefore been on notice since August 1, 1996 that they would face potential liability under the Helms-Burton Act for trafficking in confiscated property.

## VIII.   Remedies Under the Helms-Burton Act's Private Right of Action

97.     A person who "traffics" in a U.S. national's confiscated property under the Helms-Burton Act is liable to a plaintiff for money damages equal to:

(i)     the amount which is the greater of —
                        …
        (II) the amount determined [by a court-appointed special master], plus interest; or

        (III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater[.]

22 U.S.C. § 6082(a)(1)(A)(i).

98.     Pre-filing interest under the Act accrues from "the date of confiscation of the property involved to the date on which the action is brought." 22 U.S.C. § 6082(a)(1)(B). Interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System" for the calendar week preceding the date of confiscation and compounded annually. 28 U.S.C. § 1961(a) (incorporated by reference in 22 U.S.C. § 6082(a)(1)(B)).

99.     A person who "traffics" in a U.S. national's confiscated property under the Act is also liable for plaintiffs' court costs and reasonable attorneys' fees.  *See* 22 U.S.C. § 6082(a)(1)(A)(ii).

100.    The Act provides for "Increased Liability"

… If the claimant in an action under this subsection… provides, after the end of the 3-month period described in paragraph (1) notice to —

(i)     a person against whom the action is to be initiated, or

(ii)     a person who is to be joined as a defendant in the action,

at least 30 days before initiating the action or joining such person as a defendant, as the case may be, and that person, after the end of the 30-day period beginning on the date the notice is provided, traffics in the confiscated property that is the subject of the action, then that person shall be liable to that claimant for damages computed in accordance with subparagraph (C).

*See* 22 U.S.C. §§ 6082(a)(3)(B) and 22 U.S.C. 6082(a)(3)(C)(ii) (allowing damages "3 times the amount determined applicable under paragraph (1)(A)(i)").

## TRAFFICKING ALLEGATIONS

**IX.     The Confiscated Property**

101.     Plaintiffs are U.S. nationals and/or representatives of the Estates of U.S. nationals as defined by 22 U.S.C. § 6023(15)(A), who own claims to the Confiscated Property, which includes a 70-year Concession to develop docks, warehouses and port facilities on Mariel Bay and 11,000 acres of land and improvements on which various facilities of the Container Terminal are built and currently operate, including but not limited to the Container Terminal headquarters, road and rail, and other Container Terminal land used to provide Container Terminal services.   In addition, the Logistics Facility and the empty container storage yard, which are adjacent to the Container Terminal, were built and operate on confiscated land for commercial use and benefit.

**A.     Maritima Mariel SA and the 70-Year Concession**

102.     Maritima Mariel SA ("Maritima Mariel") was a Cuban corporation set up in 1954 and owned in equal parts by the Blanco Rosell Siblings, who are among the Plaintiffs in this case: Odette Blanco Rosell; Alfredo Blanco Rosell, Jr as represented by Plaintiff Emma Ruth Blanco, in her capacity as Personal Representative of Alfredo Blanco Rosell's estate; Byron Blanco Rosell as represented by Plaintiff Hebe Blanco Miyares in her capacity as Personal Representative of Byron Blanco Rosell's estate; Enrique Blanco Rosell as represented by Plaintiff Sergio Blanco, in

his capacity as Personal Representative of Enrique Blanco Rosell's estate; and Florentino Blanco

Rosell as represented by  Plaintiff Sergio Blanco, in his capacity as Personal Representative of

Florentino Blanco Rosell's estate.

103.    The Blanco Rosell Siblings received annual dividends from Maritima Mariel and

their family's other businesses.

104.    On August 15, 1955, the Cuban Government granted to Maritima Mariel a 70-year

Concession:

> 'Maritima Mariel, SA' is hereby granted the concession to plan, study, execute,
> maintain, and exploit public docks and warehouses in the Bay of Mariel Bay,
> province of Pinar del Rio Province, and the construction of new buildings and
> works, without prejudice to the rights acquired by third persons or entities under
> previous concessions still in force, for the purposes stated in this paragraph.

Decree 2367 published in the Cuban Official Gazette dated August 15, 1955 at 13864 (English

translation).  When the 70-Year Concession was granted to Maritima Mariel, there were no

previous concessions in force for the purposes stated in the foregoing quoted paragraph.

105.    The 70-Year Concession granted extensive rights far beyond the right to build,

operate, and exploit public docks and warehouses throughout Mariel Bay.  The 70-Year

Concession also authorized Maritima Mariel to exercise a series of exceptional rights in the Bay

of Mariel, including:

a)  The occupation and use, either temporary or permanent, of the lands and waters
in the public domain or under private ownership and those of the State,
province, or municipality, whenever they are essential for the execution and
exploitation of the aforementioned projects and works.

b)  The right of mandatory expropriation, in accordance with Decree No. 595 of
May 22, 1907 or any other later provision regarding ownership, possession, or
use of any real estate or private property rights for land that must be occupied
for the work, uses, and services mentioned in Section One, a procedure that may
also be used with regard to any rights granted by the State, province, or
municipality with regard to the maritime-land zone or public domain land or
property of those entities of the Nation.

c) The right to impose, on privately owned property, any class of easement for the construction of any type of roads, traffic, access, movement, and parking of vehicles, the establishment of power lines (either overhead or underground), pipes and ducts for water, gas, ventilation, or drainage, and, in general, for anything that is inherent or deemed to be necessary for the purposes of carrying out, maintaining, and exploiting the works that the aforementioned paragraph one deals with, also with the power to attend those cases of forced expropriation, as provided for in the preceding subparagraph.

d) The right to evict any tenants, sharecropper, squatter, or occupant of any other description from any property or facilities that must be occupied, either temporarily or permanently, for the projects referred to repeatedly in Section One, making a payment as compensation to the parties evicted equal to the amount of one year of rent paid in each case.

e) The right to carry out the aforementioned acts by means of applying the provisions contained in Law-Decree No. 1015 of August 7, 1953 and No. 1998 of January 27, 1955, whereby the National Finance Agency of Cuba will provide the financing of those projects.

*Id.* at 13865-13866 (English translation).

106.    The 70-year Concession also granted the right to charge and collect fees for the use of the public docks and warehouses in Mariel Bay.

107.    These exceptional rights granted in the 70-year Concession gave Maritima Mariel and the Blanco Rosell Siblings priority rights over any other rights in the Bay of Mariel, including any such rights acquired by third persons or entities under previous concessions still in force at the time the 70-year Concession was granted to Maritima Mariel. The 70-Year Concession granted Maritima Mariel the right to exclude any other person or entity from planning, studying, executing, maintaining or exploiting public docks and warehouses in the Bay of Mariel.

108.    Both Maritima Mariel and the 70-Year Concession are part of the Confiscated Property and were specifically identified in Resolution 436 as being confiscated from the Blanco Rosell Siblings by the Cuban Government.

**B.**    **Central San Ramón, Compañia Azucarera Mariel S.A., Agricola Pinillos S.A. and 11,000 Acres of Land**

109.    In addition to the 70-Year Concession and Maritima Mariel, the Blanco Rosell Siblings owned several other companies, including Agricola Pinillos, S.A. and the sugar mill then known as the Central San Ramón, which they purchased in 1949. Central San Ramón was owned and operated by Compañia Azucarera Mariel S.A. ("Azucarera Mariel"), a company wholly owned by the Blanco Rosell Siblings.

110.    The Blanco Rosell Siblings received annual dividends from these companies.

111.    The Blanco Rosell Siblings also had extensive land holdings (approximately 11,000 acres) southeast, south and west of Mariel Bay, much of which they owned through Azucarera Mariel, Agricola Pinillos S.A., and Tapia farm, which they purchased in the early 1950s. Those approximately 11,000 acres included numerous improvements such as roads, railways, buildings, and utilities.

112.    Azucarera Mariel, Agricola Pinillos, Central San Ramón and the 11,000 acres of land are part of the Confiscated Property that were specifically identified and confiscated from the Blanco Rosell Siblings by the Cuban Government, in Resolution 436.

113.    Many of the facilities at and adjacent to the Container Terminal, where Defendants operate and engage in commercially beneficial activities, sit directly on the Blanco Rosell Siblings' confiscated landholdings. Those facilities include but are not limited to the Logistics Facility, the empty container storage yard, road and rail, the headquarters of the Container Terminal itself, and other Container Terminal premises used to provide Container Terminal services. Defendants could not conduct their shipping business without their use of these facilities that sit directly on the confiscated landholdings. Defendants commercially benefit from the use of these facilities that sit directly on the confiscated landholdings.

114.    In addition, portions of the Container Terminal's vacant land that is to be developed as future facilities sit on the Blanco Rosell Siblings' confiscated land.

## X.    The Confiscation and Plaintiffs' Claims to The Confiscated Property are Publicly Known.

### A.    Cuba's Confiscation was Publicly Announced in the Cuba Official Gazette.

115.    On September 29, 1960, per Resolution 436, the Cuban Government announced the confiscation without compensation of all assets and rights, whatever their nature, then owned by the Blanco Rosell Siblings and which are herein defined as the Confiscated Property.  Such Confiscated Property includes, *inter alia*, Maritima Mariel, the 70-year Concession, Central San Ramón, Azucarera Mariel, Agricola Pinillos, as well as all the "all shares or stock certificates representing capital of the entities listed in the [other] Whereas of [Resolution 436]," which included, *inter alia*, the 70-Year Concession and all the lands owned by these entities.  *See* Resolution 436 at 23406.

116.    More specifically, on September 29, 1960, the Cuban Government published Resolution 436 in its Official Gazette on the confiscation without compensation of the following:

One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.

Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.

Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).

Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

Resolution No. 436(1) published in the Cuban Official Gazette dated September 29, 1960 at 23406 (English translation).

117.    In addition to expressly naming the 70-Year Concession and the above-referenced legal entities, Resolution 436 also expressly named the five Blanco Rosell Siblings as owners of, *inter alia*, the 70-Year Concession, Maritima Mariel, Central San Ramon, and Compania Azucarera Mariel.

118.    But for Cuba's confiscation in Resolution 436 published in the official Cuban Gazette on September 29, 1960, the 70-year Concession granted in Decree 2367 issued in 1955 would still be in force.  In any event, the 70-year Concession was cut short by Cuba's confiscation of it.

119.    According to the Cuban Official Gazette as published on September 29, 1960, the confiscation of the Confiscated Property occurred on August 19, 1960. The story of the confiscation by the Cuban Government was reported by the Revolucion newspaper on September 8, 1960.  Both the Cuban Official Gazette and the newspaper Revolucion (now known as Granma following the merger of the Revolucion and Hoy newspapers) are available to the public.

**B.    Plaintiffs' Claims to the Confiscated Property have Received Wide-Spread Media Coverage since 2019.**

120.    The fact of the confiscation of the Blanco Rosell Siblings' property in Cuba was so well known that, on April 18, 2019, the day after the Trump Administration announced that it would allow Helms-Burton Act lawsuits under Title III to go forward, stories published on both Radio Marti and TV Marti identified Plaintiffs' claims to the Mariel Special Development Zone:

The Mariel Special Development Zone, the star Cuban project to attract investment, was built on nationalized land where the Carranza-Bernal, Carbonell-González and Blanco-Rosell families owned sugar and hemp processing plants.[4]

121.    Since December 20, 2020, Plaintiffs have sued five major container cargo shipping companies for trafficking in the Confiscated Property, the claims to which are owned by Plaintiffs.[5]

122.    Plaintiffs' lawsuits and Plaintiffs' claims to the Confiscated Property have received U.S. and international news coverage, including shipping company media news coverage.  For example:

a.    On December 24, 2020, World News Today published a detailed story about Plaintiffs' first two lawsuits, wherein Plaintiffs' claims were discussed in detail.[6]

b.    On December 25, 2020, On Cuba News published a story titled "Two other lawsuits under Helms-Burton Act set sights on Port of Mariel."[7]

---

[4]    https://www.radiotelevisionmarti.com/a/propiedades-que-ya-podr%C3%ADan-reclamar-en-tribunales-de-eeuu/236777.html/ (last visited Dec. 19, 2022).

[5] *Odette Blanco de Fernandez, et al., v. Seaboard Marine, Ltd.*, Case 1:20-cv-25176-BB (S.D. Fla., Dec. 20, 2020); *Odette Blanco de Fernandez v. Crowley Maritime Corporation*, Case 3:20-cv-01426-BJD-PDB (M.D. Fla., Dec. 20, 2020); *Odette Blanco de Fernandez, et al., v. Crowley Maritime Corporation et al.,* Case 1:21-cv-20443 (S.D. Fla., Feb. 2, 2021); *Odette Blanco de Fernandez, et al. v. A.P. Moller-Maersk A/S et al.*, Case 2:21-cv-00339 (E.D. La., Feb. 17, 2021); *Odette Blanco de Fernandez, et al., v. CMA CGM S.A. (a/k/a CMA CGM The French Line; a/k/a CMA CGM Group*) *et al.*, Case 1:21-cv-22778-MGC (S.D. Fla., Jul. 30, 2021); *Odette Blanco de Fernandez, et al., v. MSC Mediterranean Shipping Company S.A.* Case 1:21-cv-23400-JEM (S.D. Fla., Sep. 22, 2021).

[6] https://www.world-today-news.com/florida-companies-sued-for-doing-business-on-land-confiscated-by-cuban-regime/ (last visited Sept. 15, 2021).

[7] https://oncubanews.com/en/cuba-usa/two-other-lawsuits-under-helms-burton-act-set-sights-on-port-of-mariel/ (last visited Sept. 15, 2021).

    c.     On February 24, 2021, TradeWinds, the self-described "Global Shipping News Source" ran an article titled "US-Cuba lawsuits show no signs of slowing down as Maersk sued."[8]

    d.     The U.S. - Cuba Trade and Economic Council, Inc. publishes a widely-disseminated blog which reports each and every Helms-Burton lawsuit filing including Plaintiffs' pending lawsuits.[9]

123.    The Confiscated Property has never been returned nor has adequate and effective compensation ever been provided, including for the 70-Year Concession or any other property interests belonging to Plaintiffs.  Nor have the claims to the Confiscated Property been settled pursuant to an international claims settlement agreement or other settlement procedure.

124.    Plaintiffs never abandoned their claims to the Confiscated Property.

**XI.    Cuba Builds Various Port of Mariel and Container Terminal Facilities Directly on the Confiscated Property.**

---

[8] https://www.tradewindsnews.com/law/us-cuba-lawsuits-show-no-signs-of-slowing-down-as-maersk-sued/2-1-967900 (last visited Sept. 15, 2021).

[9]    https://www.cubatrade.org/blog/2020/12/23/agdh6liz2sexx0emhpw0nrqaphmbnr    Seaboard Marine Is 31st Libertad Act Lawsuit- Plaintiff Targets Mariel Special Economic Zone Operations (last visited Sept. 15, 2021).

https://www.cubatrade.org/blog/2020/12/23/5ms3f5lr8xytqozz63dfr176qxose9    (Crowley Maritime Corporation Is 32nd Libertad Act Lawsuit- Plaintiffs Target Use Of ZEDM Port) (last visited Sept. 15, 2021).

https://www.cubatrade.org/blog/2021/2/18/maersk-worlds-largest-container-shipping-company-is-third-to-be-defendant-in-libertad-act-lawsuit (last visited Sept. 15, 2021).

https://www.cubatrade.org/blog/2021/8/3/pxqrf52mzej1tpilhzxgt1p7my4ajt    European    Union Member France's CMA CGM S.A. Is 41st Company Sued Using Libertad Act- Shipping To Cuba Through Jamaica And Using Port Mariel (last visited Sept. 15, 2021).

125.    The Cuban Government defines the Port of Mariel as encompassing all of Mariel Bay, including substantial portions of the Confiscated Property not only on the west side of Mariel Bay but also confiscated landholdings to the south and east of Mariel Bay.

126.    Starting in or around 2009, the Government of Cuba and various non-Cuban corporate partners built various facilities that are part of the Port of Mariel.  Those facilities include TCM's Container Terminal, road and rail and other means of transport in and around the Container Terminal, facilities adjacent to the Container Terminal that support the Port of Mariel, such as AUSA's Logistics Facility, and all associated land and facilities required to operate the Port of Mariel and the Container Terminal and provide services to its customers (the "Port Infrastructure").

127.    Much of the Port Infrastructure was built directly on the Confiscated Property.  The headquarters for TCM and its Container Terminal are located entirely on the Confiscated Property, as are various means of transport such as road and rail.[10]  AUSA's Logistics Facility and an empty container storage yard, which are adjacent to the Container Terminal, were also built entirely on the Confiscated Property.

128.    A satellite view of these and other Container Terminal facilities and facilities adjacent to the Container Terminal illustrate their location directly on the Confiscated Property:

---

[10] In addition, vacant land that Cuba has designated for development as future Container Terminal facilities sits on the Blanco Rosell Siblings' confiscated land.



129.    All land located on the west side of Mariel Bay outside the blue boundary line of the old naval air station (and which is not filled land) is the Blanco Rosell Siblings' confiscated land holdings, *i.e.*, portions of the Confiscated Property.  As this map shows, the TCM's Container Terminal has overgrown the original naval air station and covers and includes Confiscated Property.

130.    Within the blue boundary line is a portion of the Container Terminal.  However, the Container Terminal cannot operate without the portions of the Container Terminal that extend outside the blue boundary line including, most notably, the main office and headquarters of the Container Terminal that sits directly and entirely on the Confiscated Property.

131.    The above image shows that the empty container yard and the Logistics Facility (identified as the "Carilog Facility"), which are adjacent to the Container Terminal, are built on and operate on Confiscated Property.

132.    The image also shows that the Container Terminal's headquarters (identified as the "TCM Main Office"), road and rail, and various other Port Infrastructure are built and operated directly on the Confiscated Property.  Notably, the roads and railway that traverse the Confiscated Property are the only road and rail access into and out of the Container Terminal.

133.    In addition to the location of the Port Infrastructure directly on the Confiscated Property, the operation of the Port Infrastructure collectively subsumes the 70-Year Concession rights, pursuant to which the Blanco Rosell Siblings possessed the right, among other things, "to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel, province of Pinar del Rio, and the construction of new buildings and works…."  *See* Decree 2367 at 13865.

134.    Those who "plan, study, execute, maintain and exploit public docks and warehouses in Mariel Bay, Pinar del Rio Province, and the construction of new buildings and works" (Decree 2367 at 13865) are trafficking in Plaintiffs' Confiscated Property, including the 70-Year Concession.

## XII.    Defendants Directly and Indirectly Traffic in the Confiscated Property Without Plaintiffs' Authorization.

135.    MSC Med was one of the top international carriers to conduct business at the Port of Mariel.  According to Charles Baker, the general director of the Port of Mariel's container terminal:

> [Cuban state-owned carrier] Melfi is the main customer. It has about 30 percent of the business. Then following them, roughly in order, would be Maersk Line, Mediterranean Shipping Co., CMA CGM, Hamburg Sud, Cosco Container Lines

— and now China Shipping after the merger — and then Hapag-Lloyd, ZIM Integrated Shipping Services, Evergreen Line, Nirint, and Crowley …[.][11]

136.    By carrying shipments from the Port of New York and other ports in the United States to the Port of Mariel, MSC Med and MSC USA traffic in Plaintiffs' Confiscated Property. They use and benefit from Port Services and Port Infrastructure at the Port of Mariel, without which they could not conduct their Cuba shipping business.

### A.    Defendants Directly Traffic.

137.    Defendants directly traffic by contracting to carry containers to the Port of Mariel whether by directing their vessels to carry containers to the Port of Mariel or by contracting with other carriers to complete the journey from an intermediate transshipment port.   When those containers arrive at the Container Terminal at the Port of Mariel those vessels and containers receive Port Services contracted for by Defendants or their Cuban Agent Mapor Habana that require the use of Port Infrastructure on Plaintiffs' Confiscated Property.

138.    For example, Defendants' vessels and containers, and the Port Services provided to them are managed by TCM at its headquarters on the Confiscated Property.   Both MSC Med and Defendants' Cuban agent, Mapor Habana, have contracts with the TCM for use of Port Services and Port Infrastructure.   TCM and its Container Terminal are headquartered on the Confiscated Property and necessarily make use of all of the Port Infrastructure which is primarily located outside the boundaries of the former naval air station on the Confiscated Property.

---

[11] https://webcache.googleusercontent.com/search?q=cache%3Ahttps%3A%2F%2Fwww.joc.com %2Fport-news%2Fterminal-operators%2Fpsa-international%2Fmariel-port-head-outlines-cuba-long-term-shipping-prospects_20160905.html&rlz=1C5CHFA_enUS779US779&oq=cache%3Ahttps%3A%2F%2F www.joc.com%2Fport-news%2Fterminal-operators%2Fpsa-international%2Fmariel-port-head-outlines-cuba-long-term-shipping- (last visited Sept. 15, 2021).

139.    According to the Mapor Habana-MSC Med Terms and Conditions, Mapor Habana provides logistics services and the following activities at the Port of Mariel and throughout Cuba on behalf of and for the benefit of Defendants: (i) issuing bills of lading, (ii) accepting customer bookings, (iii) receiving cargo and containers, (iv) coordinating the availability of Port Services and Port Infrastructure with TCM and AUSA, and (v) arranging for inland forwarding of cargo. Exhibit C at 15-17.  This commercial activity uses or benefits from Plaintiffs' Confiscated Property.

140.    Defendants' containers are unloaded and stored at storage facilities, including at the AUSA Logistics Facility and the empty storage container yard on Confiscated Property.  The cargo in Defendants' containers is transported using road and rail over Confiscated Property.

141.    Delivery of cargo inland to customers in Cuba also uses the Confiscated Property. Cargo is gathered at AUSA's Logistics Facility.  The landward front gate of the secured area of the Container Terminal, which is located on the Angosta Peninsula surrounded on three sides by water and which is the only landward exit from the secured area of the Container Terminal, is located on the Confiscated Property.[12]  All containers that exit the Container Terminal for inland delivery in Cuba must exit from the Container Terminal on the Confiscated Property.  Therefore, all cargo delivered by MSC Med and MSC USA to the Port of Mariel for inland delivery in Cuba necessarily crosses, uses, and benefits from the Confiscated Property.

142.    All shipments of cargo by MSC Med and MSC USA to the Port of Mariel and discharged at the Container Terminal make use of the Confiscated Property because they are engaged in a commercial activity that uses or otherwise benefits from the Confiscated Property.

---

[12] Other portions of the Container Terminal, including the Container Terminal headquarters, lie outside the secured portion of the Container Terminal.

The Container Terminal straddles onto the Confiscated Property from the territory of the former naval air base and makes use of the Confiscated Property and/or is otherwise part of the facilities and infrastructure that make up the Container Terminal and which permit and otherwise enable MSC Med and MSC USA to engage in their commercial shipping business to the Port of Mariel and returning empty containers to the United States, including to the Port of New York.

143.    Bills of lading document multiple instances during 2017 through 2021 of MSC Med, acting as the disclosed principal and carrier, and MSC USA, acting as the agent, for shipments to the Port of Mariel as the final destination, including, but not limited to, the following examples:

(a)    MSC USA was the agent and MSC Med was the disclosed principal and carrier for a May 30, 2021 shipment on the vessel AGAMEMON from the Port of Long Beach to the Port of Mariel.

(b)    MSC USA was the agent and MSC Med was the disclosed principal and carrier for an April 16, 2021 shipment on the vessel JSP AMIHAN from Jacksonville, Florida to the Port of Mariel.

(c)    MSC USA was the agent and MSC Med was the disclosed principal and carrier for an April 2, 2021 shipment of on the vessel OREGON TRADER from Port Everglades, Florida to the Port of Mariel.

(d)    MSC USA was the agent and MSC Med was the disclosed principal and carrier for a March 4, 2021 shipment on the vessel OREGON TRADER from Port Everglades, Florida to the Port of Mariel.

(e)      MSC USA was the agent and MSC Med was the disclosed principal and carrier for an October 10, 2020 shipment on the vessel OREGON TRADER from Port Everglades to the Port of Mariel.

(f)      MSC USA was the agent and MSC Med was the disclosed principal and carrier for an August 18, 2020 shipment on the vessel MSC JAPAN from Long Beach, California to the Port of Mariel.

(g)      MSC USA was the agent and MSC Med was the disclosed principal and carrier for a July 29, 2020 shipment on the vessel MSC SILVIA from Long Beach, California to the Port of Mariel.

(h)      MSC USA was the agent and MSC Med was the disclosed principal and carrier for a July 23, 2013 shipment of 114 packages of "personal effects" on the vessel MSC CARMEN from New York to the Port of Mariel.

(i)      MSC USA was the agent and MSC Med was the disclosed principal and carrier for an October 12, 2017 shipment of hundreds of packages of "household goods" on the vessel MSC ZLATA R. from New York to the Port of Mariel.

(j)      MSC Med was the disclosed principal and carrier for a June 14, 2021 shipment on the vessel MSC JULIA R. from Guayaquil, Ecuador to the Port of Mariel.

(k)      MSC Med was the disclosed principal and carrier for a May 24, 2021 shipment on the vessel MSC JULIA R. from Guayaquil, Ecuador to the Port of Mariel.

(l)      MSC Med was the disclosed principal and carrier for a May 11, 2021 shipment on the vessel MSC JULIA R. from Guayaquil, Ecuador to the Port of Mariel.

(m)      MSC Med was the disclosed principal and carrier for a May 4, 2021 shipment on the vessel MSC JULIA R. from Guayaquil, Ecuador to the Port of Mariel.

(n)    MSC Med was the disclosed principal and carrier for a April 24, 2021 shipment on the vessel MSC ELOISE from Guayaquil, Ecuador to the Port of Mariel.

(o)    MSC Med was the disclosed principal and carrier for a April 18, 2021 shipment on the vessel MSC ELOISE from Guayaquil, Ecuador to the Port of Mariel.

(p)    MSC USA was the agent and MSC Med was the disclosed principal and carrier for a February 4, 2018 shipment the vessel MSC MARTA from New York to the Port of Mariel.

(q)    MSC USA was the agent and MSC Med was the disclosed principal and carrier for an August 14, 2018 shipment on the vessel MSC MARGARITA from New York to the Port of Mariel.

(r)    MSC USA was the agent and MSC Med was the disclosed principal and carrier for a December 7, 2019 shipment on the vessel LEO C from New York to the Port of Mariel.

144.    Container data on MSC Med's tracking system reveals additional details of Defendants' container shipments to the Port of Mariel, including the following examples:

- April 16, 2021 departure from Jacksonville, Florida to Mariel, Cuba under bill of lading MEDUU1162343 carrying 711 cases of wine.  Although this container carrying 711 cases of wine departed Florida on April 16, 2021, it did not arrive at the Port of Mariel until July 10, 2021.  It also took a circuitous route, as it was unloaded in the Bahamas on May 5, traveled to Panama between May 30 and June 3, and then was loaded for shipment to the Port of Mariel on July 2.

- April 2, 2021 departure from Port Everglades, Florida to Mariel, Cuba under bill of lading MEDUUZ848240 carrying 3,685 packages including scooters.

- March 4, 2021 departure from Port Everglades, Florida to Mariel, Cuba under bill of lading MEDUUZ471183 carrying 220 packages of household goods, lingerie and furniture.

- October 10, 2020 departure from Port Everglades, Florida to Mariel Cuba under bill of lading MEDUUA609079 carrying rice and soy protein.

- August 18, 2020 departure from Long Beach, California to Mariel, Cuba under bill of lading MEDUUB920764 carrying 1,395 packages.

- July 29, 2020 departure from Long Beach, California to Mariel, Cuba under bill of lading MEDUUB606264 carrying 155 packages.

145.    At all times that MSC USA was acting for itself and as agent for MSC Med under its contracts for carriage for shipments to and from Cuba, MSC USA was acting from its headquarters in New York.

146.    Importantly, MSC Med and MSC USA's container shipping business also includes returning containers from the Port of Mariel to ports of origin in the United States, including the Port of New York.  After Defendants (either directly or through their agents) unload the cargo from their containers in Cuba, whether at the Container Terminal, at the Port of Mariel,  at the Logistics Facility adjacent to the Container Terminal, or at another location outside the Port of Mariel, the empty containers are returned to and stored at the empty container yard, adjacent to the Container Terminal and directly on Confiscated Property where they await their return journey.

147.    Defendants' shipping business to Cuba constitutes commercial activity from which Defendants derive profits due, at least in part, to their use of and benefit from Plaintiffs' Confiscated Property.

   **B.    Defendants' Traffic Through the Conduct of Others.**

148.    Defendants cause, direct, participate in and/or profit from the trafficking activities of other entities that assist with their shipments to the Port of Mariel.  This also constitutes trafficking in violation of the Helms-Burton Act.

149.    TCM, AUSA, and Mapor Habana are trafficking in the Blanco Rosell Siblings' Confiscated Property within the meaning of Title III because each of them:

(i)    … transfers, distributes, dispenses, brokers, manages, or … leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in [the Confiscated Property];

(ii)    engages in a commercial activity using or otherwise benefitting from [the Confiscated Property],

(iii)    causes, directs, participates in, or profits from trafficking (as described clause (i) or (ii) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii) through another person

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A).

150.    *Mapor Habana*:  Defendants' agent Mapor Habana provides logistics services and the following activities at the Port of Mariel and throughout Cuba on behalf of and for the benefit of Defendants: (i) issuing bills of lading, (ii) accepting customer bookings, (iii) receiving cargo and containers, (iv) coordinating the availability of Port Services and Port Infrastructure with TCM and AUSA, and (v) arranging for inland forwarding of cargo.  Exhibit C at 15-17.  This commercial activity uses or benefits from Plaintiffs' Confiscated Property.

151.    *TCM and AUSA*:  Defendants' Cuba shipping business also uses and benefits from Port Services and Port Infrastructure provided by other entities such as TCM and AUSA.  Like Defendants, TCM and AUSA knowingly and intentionally use and benefit from Plaintiffs'

Confiscated Property. *See* 22 U.S.C. § 6023(13)(A)(iii). This commercial activity uses or benefits from Plaintiffs' Confiscated Property.

152. *Feeder Vessels*:   MSC Med (either directly or through its agent MSC USA) contracts third-party feeder vessels to fulfil the final leg of the shipments they deliver to the Port of Mariel:

> "Melfi has mainline services. Maersk has a mainline service coming from North Europe that started in May. Hapag-Lloyd runs services from Mexico. The rest are bringing in cargo by feeders, from Panama and Kingston and the Bahamas and a little from Caucedo [in the Dominican Republic], much of it through Isla Bonita Shipping … [.]"[13]

Two of the five vessels (currently known to Plaintiffs) that have carried MSC Med shipments to the Port of Mariel—the X-PRESS MACHU PICCCHU (seven shipments) and the Caribbean Express (two shipments)—are X-Press Feeders ships that departed from Panama. MSC Med and MSC USA purposefully and repeatedly directed vessels, or contracted with third-party feeder vessels that use and benefit from Port Services and Port Infrastructure at the Port of Mariel. This commercial activity uses or benefits from Plaintiffs' Confiscated Property.

153. *MSC USA*:   By booking all the trafficking voyages to the Port of Mariel from the United States for and on behalf of MSC Med, MSC USA caused, directed, participated in, and profited from the trafficking of MSC Med without the authorization of Plaintiffs, which constitutes trafficking. *Id.* This commercial activity uses or benefits from Plaintiffs' Confiscated Property.

---

[13]https://webcache.googleusercontent.com/search?q=cache%3Ahttps%3A%2F%2Fwww.joc.com%2Fport-news%2Fterminal-operators%2Fpsa-international%2Fmariel-port-head-outlines-cuba-long-term-shipping-prospects_20160905.html&rlz=1C5CHFA_enUS779US779&oq=cache%3Ahttps%3A%2F%2Fwww.joc.com%2Fport-news%2Fterminal-operators%2Fpsa-international%2Fmariel-port-head-outlines-cuba-long-term-shipping-prospects_20160905.html&aqs=chrome..69i57j69i58.2790j0j4&sourceid=chrome&ie=UTF-8 (last visited Sept. 15, 2021).

### C.    Defendants' trafficking is knowing and intentional.

154.    Defendants' trafficking in Plaintiffs' Confiscated Property is and has been knowing and intentional, both directly and by causing, directing, participating in, or profiting from trafficking by or through one or more other persons.

155.    Before MSC Med and MSC USA decided to expand their global business into Cuba, MSC Med and MSC USA knew that the United States imposes a comprehensive embargo on Cuba via various statutes and regulations that sanction, restrict and place conditions on companies doing business with Cuba.

156.    MSC Med and MSC USA researched those sanctions and regulatory conditions before deciding to expand their global business into Cuba.

157.    MSC Med and MSC USA knew or should have known about the Helms-Burton Act before deciding to expand their global business into Cuba. The Act is a widely publicized U.S. statute that, *i.a.*, restricts and impacts companies doing business with and in Cuba to the extent any of that business involves the use or benefit of property confiscated by the Cuban government.

158.    MSC Med and MSC USA knew or should have known that carrying shipments to Cuba was likely to involve use and benefit from confiscated property because, among other reasons, it is widely known that the Cuban government confiscated nearly all private commercial property during the Cuban revolution, including privately owned ports and surrounding lands.

159.    MSC Med and MSC USA had actual knowledge of the Helms-Burton Act in 2019. They knew that the Trump Administration was planning to activate Title III of the Helms-Burton Act from suspension.

160.    Pierfrancesco Vago is the former Line Manager for MSC Med's USA, Mexico, and Canada businesses and current Executive Chairman of MSC Cruises.  Mr. Vago also oversees

MSC Group's subsidiaries and serves as Chair of the MSC Foundation's Executive Committee. On February 22, 2019, Mr. Vago signed a letter to the U.S. Secretary of State Michael R. Pompeo urging him not to activate Title III of the Helms-Burton Act and acknowledging and admitting that "U.S. businesses that were not active in Cuba in 1996 but are today would *now face exposure to a new legal risk in U.S. courts*." *See* Exhibit D (emphasis added). Mr. Vago also acknowledged that "U.S. citizens who were Cuban nationals at the time of expropriation" could sue these companies under the Helms-Burton Act.

161.    MSC Med and MSC USA continued to conduct their business in Cuba for at least two years after Mr. Vago acknowledged and admitted that businesses would face legal exposure by doing so.

162.    MSC Med and MSC USA are subsidiaries of MSC Group. Mr. Vago oversees the MSC Group's subsidiaries and therefore oversees MSC Med and MSC Group. In 2019, when Mr. Vago wrote to the U.S. Secretary of State acknowledging that "U.S. businesses" operating in Cuba after the activation of Title III of the Helms-Burton Act would "face exposure to a new legal risk in U.S. courts," an internet search likely would have shown Plaintiffs' interests in the Confiscated Property. *See, for example,* "10 Key Properties in Cuba with Potential Lawsuits in the US" (translated from https://www.radiotelevisionmarti.com/a/propiedades-que-ya-podr%C3%ADan-reclamar-en-tribunales-de-eeuu/236777.html/) (April 18, 2019) (identifying the Port of Mariel as including property confiscated from the Blanco Rosells).

163.    Defendants either conducted that internet search, knew of Plaintiffs' interest in the Confiscated Property, and continued to knowingly and intentionally traffic in the Confiscated Property for two years, or Defendants willfully chose not to conduct even minimal due diligence even though Mr. Vago admits they were aware of the "legal risk." In either scenario, Defendants

knew or should have known of Plaintiffs' interests in the Confiscated Property in 2019 and they continued to traffic for two years.

164.    MSC Med and MSC USA chose to use the Port of Mariel in Cuba as the port of call to deliver and unload containers that it contracted to deliver from New York and other U.S. ports to the Port of Mariel.  MSC Med and MSC USA could have called at and used the port in Santiago de Cuba to deliver containers.

165.    In sum, and as the facts demonstrate, Defendants MSC Med and MSC USA traffic in the Confiscated Property because:

(a)    TCM and AUSA use an interest in the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(i);

(b)    TCM and AUSA manage, distribute, dispense, broker, possess, have obtained control of or otherwise have acquired an interest in the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(i);

(c)    TCM leases or has otherwise acquired or holds an interest in the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(i);

(d)    Defendant engages in business activities using or otherwise benefitting from the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(ii);

(e)    Defendant MSC Med engages in business activities with TCM, AUSA, and Mapor Habana for the purpose of making money which Defendants could not otherwise do if there were not ports, docks, and warehouses that had not been planned, studied, developed, built, maintained, and available to be used and exploited in the Bay of Mariel pursuant to 22 U.S.C. § 6023(13)(A)(ii);

(f)    Defendants MSC Med and MSC USA profit from trafficking by TCM, AUSA, and Mapor Habana as described in (a) through (e) of this paragraph pursuant to 22 U.S.C. § 6023(13)(A)(iii);

(g)    (g)    Defendant MSC USA profits from trafficking by or through Defendant MSC Med as described in (a) through (e) of this paragraph pursuant to 22 U.S.C. § 6023(13)(A)(iii); Defendant MSC Med causes, directs and/or participates in trafficking by or through its agent, Mapor Habana, as described in (a) through (e) of this paragraph without the authorization of Plaintiffs pursuant to 22 U.S.C. § 6023(13)(A)(iii); and

(h)    All of the above (a) through (h) are done without the authorization of Plaintiffs.

## XIII.  Plaintiffs Notified Defendants that Defendants are Trafficking in the Confiscated Property.

166.    On June 3, 2021, Plaintiffs, through counsel, sent MSC Med and MSC USA a letter pursuant to 22 U.S.C. § 6082(a)(3)(D) ("Notice Letter") notifying MSC Med and MSC USA that they are trafficking in confiscated property as defined in the Helms-Burton Act, the claims to which are owned by Plaintiffs, without the authorization of Plaintiffs.

167.    Plaintiffs sent the Notice Letter by FedEx, International Priority, and separately, by the United States Postal Service ("USPS") International Registered Mail.

168.    FedEx delivered the Notice Letter to MSC Med on June 7, 2021 and MSC USA on June 7, 2021.

169.    The USPS delivered the Notice Letter to MSC Med on July 2, 2021 and MSC USA on or before the same date.

170.    On June 30, 2021 MSC Med and MSC USA's counsel sent Plaintiff's counsel a letter acknowledging receipt of the Notice Letters.  Letter from R. Brodsky to D. Baron (Jun. 30, 2021) (Exhibit E, hereto).

171.    MSC Med and MSC USA's June 30, 2021 letter also admitted that MSC Med had been offering "services in relation to the alleged Confiscated Property" and alleged that MSC ceased providing such services "[u]pon receipt" of the Notice Letter:

> Upon receipt of the Notices, MSC SA promptly instructed that all services offered in relation to the alleged Confiscated Property (as defined in the Notices) must cease with immediate effect. Thus, to the extent any MSC entity has engaged in any alleged trafficking as defined under the Helms-Burton Act (which we strongly dispute), such trafficking even under the broadest possible meaning has terminated. If Claimants still intend to pursue their claims against MSC and to the extent Claimants have any viable uncertified claims (which they do not), MSC will not be liable to the Claimants for treble damages. See 22 U.S.C. § 6082(a)(2)(B).

Letter from R. Brodsky to D. Baron (Jun. 30, 2021) (Exhibit E, hereto).

172.    However, MSC Med and MSC USA have continued to traffic since they received the Notice Letter.

173.    MSC Med admitted that it continued to carry shipments and send vessels to the Port of Mariel after it received the Notice Letter.

174.    The TCM still lists MSC Med as one of "OUR CUSTOMERS":



http:tcmariel.cu/?lang+en (visited July 18, 2022) (bottom of page).

175.    Because MSC Med and MSC USA did not obtain the authorization of Plaintiffs with regard to these acts of trafficking, occurring both before and after receiving the Notice Letter, Plaintiffs were injured by MSC Med and MSC USA's acts of trafficking in the Confiscated Property to which Plaintiffs own claims and MSC Med and MSC USA are subject to treble damages.

176.    Plaintiffs have been injured by MSC Med and MSC USA's unauthorized acts of trafficking in the confiscated property to which Plaintiffs own claims because, *inter alia*:

(a)    MSC Med and MSC USA are profiting without obtaining consent from or paying adequate compensation to Plaintiffs;

(b)    MSC Med's and MSC USA's failure to obtain permission and pay for use of the Confiscated Property constitutes a pocketbook injury to Plaintiffs.

(b)    Plaintiffs are not receiving the benefit of their interests in the Confiscated Property;

(c)    MSC Med and MSC USA are profiting without obtaining authorization or paying adequate compensation to Plaintiffs for authorization to traffic in the confiscated property;

(d)    MSC Med and MSC USA are profiting or otherwise benefiting from trafficking in the Confiscated Property by or through others without obtaining authorization from, or paying adequate compensation to, Plaintiffs;

(e)    MSC Med and MSC USA's trafficking in the Confiscated Property has undermined Plaintiffs' rights to compensation for the Confiscated Property;

(f)     MSC Med and MSC USA have profited from their use of the Confiscated Property at Plaintiffs' expense;

(g)     MSC Med and MSC USA have denied Plaintiffs the ability to obtain economic rent that could have been negotiated for in exchange for their authorization to MSC Med and MSC USA to traffic in the Confiscated Property;

(h)     MSC Med and MSC USA have appropriated from Plaintiffs the leverage from the Helms-Burton Act that Plaintiffs would have had on the Cuban Government to negotiate compensation for their Confiscated Property;

(i)     MSC Med and MSC USA have injured Plaintiffs by trafficking in the Confiscated Property without Plaintiffs' authorization and without making any payment of compensation to Plaintiffs because in the Helms-Burton Act, Congress provided the rightful owners of confiscated property with the right to be compensated from defendants who have economically exploited the confiscated property;

(j)     MSC Med and MSC USA injured Plaintiffs by trafficking in the particularized Confiscated Property to which Plaintiffs own claims without seeking or obtaining Plaintiffs' authorization to traffic in that particularized Confiscated Property and as a result Defendants' failure to do so has resulted in concrete and particularized monetary harm and injury to Plaintiffs; and

(k)     The harms and injuries suffered by Plaintiffs as a result of Defendants' failure to obtain Plaintiffs' authorization to traffic in the Confiscated

Property have a close relationship to traditionally recognized common-law actions for unjust enrichment, trespass, trespass to chattels, and conversion.

(l)    There is a direct causal link between Plaintiffs' injuries from the Cuban Government's confiscation of the Confiscated Property and Defendants' unjust enrichment, trespass, trespass to chattels, and/or conversion from Defendants' commercially beneficial use of the Confiscated Property without Plaintiffs' authorization.

(m)    MSC Med's and MSC USA's trafficking in the Confiscated Property without Plaintiffs' authorization has caused a concrete injury to Plaintiffs that is traceable to MSC Med and MSC USA and has a close relationship to harms traditionally recognized providing a basis for a lawsuit in American courts – such as unjust enrichment, trespass, trespass to chattels and conversion.

**CLAIM FOR DAMAGES**
**TITLE III OF THE HELMS-BURTON ACT**
**(Against MSC Med and MSC USA)**

177.    Plaintiffs incorporate by reference all of the foregoing Paragraphs as if fully set forth herein.

178.    This case is brought pursuant to Title III of the Helms-Burton Act, 22 U.S.C. § 6082.

179.    MSC Med and MSC USA did traffic, as the term "traffic" is defined in 22 U.S.C. § 6023(13)(A), in the Confiscated Property without authorization of Plaintiffs who own claims to the Confiscated Property.  Defendants are therefore liable to Plaintiffs under the Helms-Burton Act.

180.    MSC Med and MSC USA have trafficked in the Confiscated Property by knowingly and intentionally carrying or directing containers to be carried to the Port of Mariel in Cuba where containers are off-loaded and other containers are loaded, all using the services and premises of the Container Terminal including its headquarters, roads and railway located directly on the Confiscated Property, either directly or by causing, directing, participating in, or profiting from trafficking by or through another person.  MSC Med uses, benefits, and profits from the Port of Mariel facilities including the ports, docks, warehouses, and facilities.  Defendant also engages in commercial activities using or otherwise benefitting from the Port of Mariel's facilities located on Plaintiffs' Confiscated Property, including but not limited to the Logistics Facility and empty container storage yard.

181.    MSC Med and MSC USA have trafficked in the Confiscated Property by knowingly and intentionally (a) storing their containers at the warehouses at the Container Terminal at the Port of Mariel located directly on the Confiscated Property, (b) arranging for the transport of their containers within the Container Terminal, the Port of Mariel and inland into Cuba using the Logistics Facility adjacent to the Container Terminal located directly on the Confiscated Property, (c) loading and unloading containers from their vessels using the services and premises of the Container Terminal, including its headquarters at the Port of Mariel located directly on the Confiscated Property, and (d) transporting their containers throughout the Port of Mariel using road and rail located directly on the Confiscated Property, among other uses of facilities and services offered at the Port of Mariel directly on the Confiscated Property.

182.    MSC Med and MSC USA also have trafficked in the Confiscated Property by knowingly and intentionally directing container ships to the Port of Mariel in Cuba, either directly or by causing, directing, participating in, or profiting from trafficking by or through another

person.  When in the Port of Mariel, the container ships call at, and/or otherwise use, benefit, and profit from the Port of Mariel facilities including the ports, docks, warehouses, roads, railway, and facilities, many of which are located directly on the Confiscated Property.  Defendant MSC Med also engages in commercial activities using or otherwise benefitting from the Port of Mariel facilities and Plaintiffs' Confiscated Property including, but not limited to, the 70-Year Concession, without the authorization of Plaintiffs.  By booking all the trafficking voyages to the Port of Mariel for and on behalf of MSC Med, MSC USA caused, directed, participated in, and profited by and through the trafficking of MSC Med without the authorization of Plaintiffs.

183.    MSC Med and MSC USA are therefore trafficking in Plaintiffs' Confiscated Property and benefit or profit from the trafficking of the TCM and AUSA in Plaintiffs' Confiscated Property without the authorization of Plaintiffs.

184.    MSC Med and MSC USA, as a result of carrying containers to the Port of Mariel and as a result of directing containers ships to the Port of Mariel, also have trafficked in the Confiscated Property by knowingly and intentionally participating in, benefitting from, and profiting from the commercial activities of the TCM, AUSA, and/or Mapor Habana's trafficking in the Confiscated Property without the authorization of Plaintiffs.

185.    MSC Med and MSC USA engage in a commercial activity using or otherwise benefitting from the Confiscated Property.

186.    MSC Med and MSC USA also cause, direct, participate in, or profit from trafficking by the Container Terminal, AUSA, and the ZEDM in the Confiscated Property.

187.    MSC Med and MSC USA have had actual knowledge of Plaintiffs' claims to the Confiscated Property since at least June 7, 2021, due to Plaintiffs' Notice Letter mentioned above.

188.    Prior to expanding their shipping business to Cuba, MSC Med and MSC USA researched the applicable U.S. sanctions and regulations governing commercial dealings in Cuba.

189.    In February 2019, Defendants were aware that the Trump Administration planned to activate Title III of the Helms-Burton Act and lobbied against it, acknowledging that the continued operation of its business in Cuba once Title III was in effect would expose them to potential legal liability.

190.    Defendants were aware that the Trump Administration did allow Title III's suspension to lapse, and Defendants continued to operate their business in Cuba with knowledge that they were exposed to legal liability for doing so.

191.    At that time, in 2019, Defendants knew or should have known of Plaintiffs' interest in the Confiscated Property.

192.    Prior to MSC Med and MSC USA's receipt of Plaintiffs' Notice Letters, MSC Med and MSC USA knew or had reason to know that Plaintiffs own claims to the Confiscated Property.

193.    Prior to MSC Med and MSC USA's receipt of Plaintiffs' Notice Letters, MSC Med and MSC USA knew or had reason to know that the Container Terminal was trafficking in the Confiscated Property.

194.    Prior to MSC Med and MSC USA's receipt of Plaintiffs' Notice Letters, MSC Med and MSC USA knew or had reason to know that the ZEDM was trafficking in the Confiscated Property.

195.    Prior to MSC Med and MSC USA's receipt of Plaintiffs' Notice Letters, MSC Med and MSC USA knew or had reason to know that AUSA was trafficking in the Confiscated Property.

196.     MSC Med and MSC USA's continued trafficking in the Confiscated Property more than 30 days after its receipt of Plaintiffs' Notice Letters subjects MSC Med and MSC USA to treble damages.  22 U.S.C. § 6082(a)(3).

197.     The Container Terminal, AUSA, and the ZEDM did not ever seek or obtain Plaintiffs' authorization to traffic in the Confiscated Property, including the 70-Year Concession, the land, or any other Confiscated Property at any time.

198.     The Container Terminal, AUSA, and the ZEDM's knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking as defined 22 U.S.C. § 6023(13).

199.     MSC Med and MSC USA did not seek nor obtain Plaintiffs' authorization to traffic in the Confiscated Property at any time.

200.     MSC Med and MSC USA's knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking as defined in 22 U.S.C. § 6023(13).

201.     As a result of MSC Med and MSC USA's trafficking in the Confiscated Property, MSC Med and MSC USA are liable to Plaintiffs for all money damages allowable under 22 U.S.C. § 6082(a) including, but not limited to, those equal to:

a.     The amount which is the greater of: … (i) the amount determined by a special master pursuant to 22 U.S.C. § 6083(a)(2); or (ii) the current "fair market value" of the Confiscated Property, or the original fair market value of the Confiscated Property plus pre-filing interest;

b.     Three times the amount determined above (treble damages);

c.     Prejudgment interest; and

d.     Court costs and reasonable attorneys' fees, and expenses.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against MSC Med and MSC USA as follows:

A.    Awarding damages as allowed by law including treble damages and pre-filing interest as provided by the Act;

B.    Awarding prejudgment interest as allowed by law on any amounts awarded;

C.    Awarding attorneys' fees, costs, and expenses; and

D.    Awarding such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable, and a trial pursuant to Rule 39(c), Federal Rules of Civil Procedure, as to all matters not triable as of right by a jury.

Dated:  December 20, 2022                          Respectfully submitted,

LAW OFFICE OF DENNIS O. COHEN, PLLC

By: _____
Dennis O. Cohen
157 13th Street
Brooklyn, NY 11215
(646)859-8855
dennis@denniscohenlaw.com

*Counsel for Plaintiffs*

*Of counsel*:

David A. Baron
S.D.N.Y. Bar No. DB4989
dbaron@bcr-dc.com
Melvin White (admitted *pro hac vice*)
mwhite@bcr-dc.com
Dale Eppler (*pro hac vice* motion forthcoming)
deppler@bcr-dc.com
Laina C. Lopez (admitted *pro hac vice*)
lcl@bcr-dc.com
Jared R. Butcher (admitted *pro hac vice*)
jbutcher@bcr-dc.com
Berliner Corcoran & Rowe LLP
1101 17th Street, N.W., Suite 1100
Washington, D.C. 20036-4798
Tel:  (202) 293-5555
Facsimile:  (202) 293-9035

Richard W. Fields (*pro hac vice* motion forthcoming)
fields@fieldslawpllc.com
Martin Cunniff (*pro hac vice* motion forthcoming)
MartinCunniff@fieldslawpllc.com
Edward Han (*pro hac vice* motion forthcoming)
edhan@fieldslawpllc.com
Fields PLLC
1701 Pennsylvania Ave, N.W., Suite 200
Washington, D.C. 20006
Tel:  (833) 382-9816