USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/9/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

ODETTE BLANCO DE FERNANDEZ, *born*
*Blanco Rosell, et al.*,

                             Plaintiffs,

                    -against-

MSC MEDITERRANEAN SHIPPING
COMPANY S.A., *and* MEDITERRANEAN
SHIPPING COMPANY (USA) INC.,

                          Defendants.

-------------------------------------------------------------X

           1:22-cv-6305-GHW

           <u>MEMORANDUM OPINION &</u>
                    <u>ORDER</u>

GREGORY H. WOODS, United States District Judge:

      In 1996, Congress passed the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021, *et seq.*, also known as the Helms-Burton Act, which provides a private cause of action against persons who "traffic" in property confiscated by the Cuban government. That cause of action was suspended by presidential decree until 2019, when President Trump lifted the suspension for the first time. A series of actions brought under the Act soon followed. This case is one such action.

      Plaintiff Odette Blanco de Fernandez was one of five siblings who owned, in equal parts, a collection of companies with title to land surrounding the bay in Mariel Bay, Cuba. The Cuban government confiscated the companies in 1960 and built the Port of Mariel on the land in 2009. Four years later, in 2013, Defendants MSC Mediterranean Shipping Company, S.A. ("MSC Cargo") and Mediterranean Shipping Company (USA) Inc. ("MSC USA") began shipping cargo through the Port of Mariel. Defendants made hundreds of shipments to and from the port over the next eight years.

In 2022, Ms. de Fernandez and the estates and inheritors of her siblings brought this action under the Act, alleging that Defendants had trafficked in their confiscated property by shipping at the Port of Mariel. Defendants now move to dismiss the claim against MSC Cargo for lack of personal jurisdiction, and to dismiss this action for failure to state a claim. Ms. de Fernandez's claims survive both motions, because she provides sufficient allegations of suit-related conduct in this forum and of trafficking in her confiscated property. However, the estates and inheritors of her siblings fail to state a claim because they did not acquire their claims until after March 12, 1996, the Act's cutoff for claims arising from property confiscated before that date.

## I.    BACKGROUND

### A.    Facts Alleged in the First Amended Complaint

Plaintiff Odette Blanco de Fernandez, née Blanco Rosell, and her siblings Alberto Blanco Rosell, Jr., Florentino Blanco Rosell, Enrique Blanco Rosell, and Byron Blanco Rosell (together, the "Blanco Rosell Siblings"), were Cuban nationals who owned, in equal parts, several Cuban companies with holdings in Mariel Bay, Cuba. Dkt. No. 39 ¶¶ 2, 102, 109 (First Amended Complaint, hereinafter "FAC"). Among other things, the companies owned a 1955 concession from the former Cuban government "to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel Bay," *id.* ¶ 104, as well as "extensive landholdings" around the bay, *id.* ¶ 111. The landholdings covered the entire west side of Mariel Bay except for certain land dedicated to an old naval air station. *Id.* ¶¶ 128–29.

On September 29, 1960, the Cuban government confiscated the companies. *Id.* ¶ 2. The Blanco Rosell Siblings "fled Cuba after the confiscation," *id.* ¶ 5, and became naturalized United States citizens between 1966 and 1975. *Id.* ¶¶ 9–13. Between 2001 and 2014, four of the siblings died. *Id.* ¶¶ 10–13. Ms. de Fernandez was the only living sibling when Plaintiffs brought this action. *Id.* ¶ 9. The personal representatives of the four siblings' estates are co-plaintiffs with Ms. de

Fernandez, *id.* ¶ 102 (the "Estate Plaintiffs"), as well as various family members who allegedly

inherited portions of the four siblings' claims, *id.* ¶¶ 14–26 (the "Inheritor Plaintiffs").

In 2009, the Cuban government built various port and storage facilities on the west side of

Mariel Bay.  *Id.* ¶¶ 126–27.  Those facilities comprise "part of the Port of Mariel."  *Id.* ¶¶ 125–26.

The facilities include a "Container Terminal," "road and rail and other means of transport in and

around the Container Terminal," and a "Logistics Facility," all of which support the Port of Mariel.

*Id.* ¶ 126.  The Container Terminal is mostly built within the boundaries of the old naval air station,

but its headquarters are located outside those borders on allegedly confiscated land.  *Id.* ¶ 128.  The

other facilities also lie on allegedly confiscated land.  *Id.*

Defendant MSC Cargo[1] is a container shipping company "organized under the laws of

Switzerland with its principal place of business [in] Geneva, Switzerland."  *Id.* ¶¶ 27, 29.  Defendant

MSC USA is a subsidiary of MSC Cargo.  Mem. at 10.  MSC USA is MSC Cargo's "general agent for

shipments from the United States."  FAC ¶ 31; *see also* Mem. at 10 ("[T]he provision of MSC Cargo's

transportation services in the United States is handled by [MSC USA].").  Whenever MSC USA ships

cargo from the United States, it executes a bill of lading with the shipper.  *See* FAC ¶ 72.  Among

other things, the bill of lading "list[s] the port of loading, the port of discharge, the places of receipt

and delivery for the shipment, . . . a description of the goods, and details about the shipper and other

parties involved in the shipment."  *Id.*  Each bill of lading provides that it is "'[s]igned by [MSC

USA] as Agent on behalf of the Carrier [MSC Cargo],' or words to that effect."  *Id.* ¶ 52.

Beginning in 2013, MSC USA, on behalf of MSC Cargo, began shipping cargo from ports in

the United States to the Port of Mariel.  *See id.* ¶ 143(h).  From 2016 to 2021, Defendants

"contracted to serve as the carrier for approximately 273 cargo shipments from various U.S. Ports."

---

[1] The FAC refers to MSC Mediterranean Shipping Company SA as "MSC Med," FAC ¶ 27, but both parties' briefs refer to the company as "MSC Cargo," Mem. at 1; Opp. at 5.  The Court uses MSC Cargo, as both of Defendants' corporate names begin with "MSC Med."  FAC ¶¶ 27, 30.

*Id.* ¶ 50.  On at least five occasions between July 2013 and December 2019, Defendants shipped cargo from ports in New York to the Port of Mariel.  *Id.* ¶¶ 143(h), 143(i), 143(p), 143(q), 143(r).

On June 3, 2021, Plaintiffs, through counsel, sent MSC Cargo and MSC USA a notice letter stating "that they are trafficking in confiscated property as defined in the Helms-Burton Act, the claims to which are owned by Plaintiffs, without the authorization of Plaintiffs."  *Id.* ¶ 166. Defendants received the notice letter on June 7, 2024.  FAC ¶ 168.  On June 30, 2021, Defendants, through counsel, sent Plaintiffs a response letter "acknowledging receipt" of the notice letters.  *Id.* ¶ 170; *id.* Ex. E.  The letter stated, among other things, that upon receiving the notice letters, "MSC [Cargo] promptly instructed that all services offered in relation to the alleged Confiscated Property (as defined in the Notices) must cease with immediate effect."  *Id.* ¶ 170; *id.* Ex. E.  The FAC alleges that Defendants called at the Port of Mariel on at least two occasions after they received Plaintiffs' notice letter, on June 14, 2021, *id.* ¶ 143(j), and July 10, 2021, *id.* ¶ 144.  The FAC does not allege the departure date for the former shipment.  *Id.* ¶ 143(j).  The latter shipment allegedly departed from Florida on April 16, 2021.  *Id.* ¶ 144.

### B.  Defendants' Declarations

In conjunction with their motion to dismiss, Defendants submitted the Declaration of Frank R. Sanford in Support of Defendants' Motion to Dismiss, Dkt. No. 42 ("Sanford Decl."), the Declaration of Diana Sterk in Support of Defendants MSC Mediterranean Shipping Company SA and MSC Mediterranean Shipping Co. (USA) Inc.'s Motion to Dismiss, Dkt. No. ("Sterk Decl."), and the Supplemental Declaration of Frank R. Sanford in Support of Defendants' Motion to Dismiss, Dkt. No. 50 ("Supp. Sanford Decl.").  Both Sanford Declarations assert certain facts which may be considered for the purposes of Defendants' motion to dismiss for lack of personal jurisdiction.  *See infra* Part IIa.  The relevant assertions are recounted here.

Defendants assert that MSC USA is MSC Cargo's subsidiary, and that MSC USA "handle[s]" "MSC Cargo's transportation services in the United States." Sanford Decl. ¶ 7. Defendants also state that "[n]either MSC Cargo nor MSC USA shipped any cargo to the port of Mariel, Cuba, from or through New York since December 2019." *Id.* ¶ 23. And they state that "MSC Cargo has not accepted any bookings for shipments to Cuba from the United States since June 7, 2021." *Id.* ¶ 33.

Moreover, Defendants acknowledge that there were "two shipments facilitated by MSC Cargo from the United States [that] arrived at the port of Mariel after June 7, 2021," when they received Plaintiffs' notice letter. *Id.* ¶¶ 25, 30. One of the shipments was described in the FAC. It left port in Jacksonville, Florida on April 16, 2021 and "discharged . . . at the port of Mariel, Cuba" "[o]n July 10, 2021." *Id.* ¶ 31. Defendants also identify a second shipment, not alleged in the FAC, that left Long Beach, California on May 19, 2021 and "discharged . . . at the port of Mariel, Cuba" "[o]n July 25, 2021." *Id.* ¶ 32.

Defendants state that every shipment they made from the United States to Cuba was made by "transshipment." *Id.* ¶¶ 15, 19. Defendants describe the two methods by which they transport cargo: "direct service" or "transshipment." *Id.* ¶ 15. "Direct service means that the same vessel calls at both the port of loading and the port of discharge." *Id.* By contrast, "[t]ransshipment occurs whenever a container is offloaded at an intermediate port and temporarily stored there until it can be loaded onto a different vessel that will continue the shipment to the port of discharge." *Id.* Still, even under transshipment, "MSC Cargo's responsibility for the goods ends" only when delivery is made at the final "port of discharge or at the place of delivery." *Id.*

Defendants state that both post-notice shipments, like their other shipments from the United States to Cuba, were made by transshipment. *Id.* ¶¶ 31–32. Moreover, while MSC Cargo owned the cargo-carrying vessels that left the United States, it did not own the vessels that ultimately discharged the cargo at the Port of Mariel. *Id.*

### C. Procedural History

Plaintiffs brought this action on July 25, 2022.  Dkt. No. 1.  The action was originally assigned to Judge Stanton.  Dkt. No. 48.  Plaintiffs filed the FAC on December 20, 2022.  Dkt. No. 39.  The FAC brings one cause of action against both Defendants, for trafficking under the Helms-Burton Act.  FAC at 54.

Defendants moved to dismiss the FAC on January 17, 2023.  Dkt. No. 40 ("Motion"); Dkt. No. 41 ("Mem"); Dkt. No. 42 (Sanford Decl.); Dkt. No. 43 (Sterk Decl.); Dkt. No. 46 ("Opp."); Dkt. No. 49 ("Reply"); Dkt. No. 50 ("Supp. Sanford Decl.").

On February 28, 2023, this action was reassigned to this Court.  Dkt. No. 48.  On March 29, 2023, Plaintiffs requested, with the consent of Defendants, that the Court stay this case pending a decision in a related case before the United States District Court for the Southern District of Florida.  Dkt. No. 56.  In that case, Plaintiffs had brought a Helms-Burton action against a different shipping company, and the court issued a summary judgment opinion, *De Fernandez v. Seaboard Marine, Ltd.*, No. 20-CV-25176, 2022 WL 3577078 (S.D. Fla. Aug. 19, 2022), which Defendants argued had preclusive effect on certain issues in this case.  Dkt. No. 56, at 1.  Plaintiffs requested a stay pending the *Seaboard Marine* court's decision on their motion for vacatur of the summary judgment opinion.  *Id.*  On March 30, 2023, the Court granted Plaintiffs' request.  Dkt. No. 57.  The Court stayed all proceedings in this case and withdrew Defendants' motion to dismiss.  *Id.*

On June 14, 2023, the *Seaboard Marine* court denied Plaintiffs' motion to vacate, *de Fernandez v. Seaboard Marine, Ltd.*, No. 20-CV-25176, 2023 WL 3970930 (S.D. Fla. June 13, 2023), and Defendants requested that the Court lift the stay in this case.  Dkt. No. 60.  On June 15, 2023, the Court granted Defendants' request, and stated that it would take up Defendants' previously filed motion to dismiss.  Dkt. No. 61.

Between March 28, 2023 and February 28, 2024, the parties filed eight letters purporting to raise relevant supplemental authority. Plaintiffs filed five such letters, Dkt. Nos. 53, 63, 65, 69, 70, and Defendants filed three, Dkt. Nos. 64, 68, 71. The Court did not solicit these letters, each of which was filed after the close of briefing. Accordingly, "[t]o the extent these letters could be viewed as raising new arguments," "those arguments need not (and will not) be considered." *Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc. v. Société Générale, S.A.*, No. 1:20-CV-851 (MKV), 2023 WL 2712505, at *6 n.8 (S.D.N.Y. Mar. 30, 2023); *accord Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 337 F. Supp. 3d 274, 288 (S.D.N.Y. 2018) ("Caselaw in this Circuit confirms that a court need not consider new claims raised in supplemental letters filed without leave of the Court.").

## II.    LEGAL STANDARD

### a.    Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2)

On a motion to dismiss pursuant to Rule 12(b)(2), the non-movant "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (*per curiam*)); *accord Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (similar). The non-movant's burden of proof "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). At the pleading stage, and prior to discovery, a non-movant need only make a *prima facie* showing that jurisdiction exists. *Id.* at 84–85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a [non-movant] must make a prima facie showing that jurisdiction exists.") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)). "This prima facie showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would

suffice to establish jurisdiction over the defendant.'" *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

"On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the four corners of the complaint and consider materials outside the pleadings, including accompanying affidavits, declarations, and other written materials." *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 760 (S.D.N.Y. 2021); *accord MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012). The allegations in the complaint and the non-movant's affidavits must be taken "as true 'to the extent they are uncontroverted' by the [movant's] affidavits, 'which the district court may also consider.'" *NuMSP, LLC v. St. Etienne*, 462 F. Supp. 3d 330, 341 (S.D.N.Y. 2020) (quoting *GlaxoSmithKline LLC v. Laclede, Inc.*, No. 18-cv-4945, 2019 WL 293329, at *3 (S.D.N.Y. Jan. 23, 2019)) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012)). On the other hand, "[w]hen a defendant provides affidavits to support a Rule 12(b)(2) motion, the plaintiff may not simply rest on the allegations of the complaint." *Laufer Grp. Int'l, Ltd. v. Standard Furniture Mfg. Co., LLC*, No. 19-CV-10885 (JPO), 2020 WL 4735123, at *2 (S.D.N.Y. Aug. 14, 2020) (quoting 4 Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 1067.6 (4th ed. 2019)). Where "the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673 (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)). Courts will not, however, "draw argumentative inferences in the [non-movant's] favor . . . [or] accept as true a legal conclusion couched as a factual allegation." *Id.* (internal quotation marks and citation omitted).

District courts "resolving issues of personal jurisdiction must . . . engage in a two-part analysis." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). "First, they must determine whether there is jurisdiction over the [movant] under the relevant forum state's laws. . . . Second, they must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements." *Id.* "To establish personal jurisdiction over a [movant], due process requires a [non-movant] to allege (1) that a [movant] has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks*, 714 F.3d at 673 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "To determine whether a [party] has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *Id.* Courts "may assert general personal jurisdiction over a [party] to hear any and all claims against that [party] only when the [party]'s affiliations with the State in which the suit is brought 'are so constant and pervasive so as to render it essentially at home in the forum State.'" *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)). Specific jurisdiction, by contrast, "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

The New York State long-arm statute provides for general jurisdiction under Section 301 of the New York Civil Practice Law and Rules (the "N.Y. C.P.L.R."). *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000). A court may assert general personal jurisdiction over a corporate defendant where the defendant's place of incorporation or principal place of business lies within the court's district. *See, e.g., Maria, et al. v. Massachusetts Institute of Technology, et al.*, No. 1:22-CV-10959 (ALC) (SN), 2024 WL 4350826, at *5 (S.D.N.Y. Sept. 30, 2024); *see also Goodyear*, 564 U.S. at 924

(explaining that, for corporate defendants, the "paradigm forum for the exercise of general jurisdiction" is its "place of incorporation[] and principal place of business" (citation omitted)).

In addition to general jurisdiction, "[t]he New York long arm statute authorizes personal jurisdiction over non-domiciliar[ies] under [section 302(a)]." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001) (citing N.Y. C.P.L.R. § 302(a)).  N.Y. C.P.L.R. § 302(a)(1) permits a court to exercise personal jurisdiction over an out-of-state party if that party "transacts any business within the state," and if the claim arises from these business contacts.  *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986).  "To meet the transacting business element under [section] 302(a)(1), it must be shown that a party purposely availed [itself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) (internal quotation marks omitted).  "To determine whether a party has transacted business in New York, courts must look at the totality of circumstances concerning the party's interactions with, and activities within, the state." *Id.* at 105 (internal quotation marks omitted).  "Although it is impossible to precisely fix those acts that constitute a transaction of business, [New York] precedents establish that it is the quality of the [movant's] New York contacts that is the primary consideration." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (N.Y. 2007).

### b. Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the Court "constru[es] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. N.Y.*

*Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)).

"To survive a 12(b) motion, a plaintiff must allege facts that, accepted as true, make out the elements of a claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 308 (S.D.N.Y. 2001). Failure to adequately allege "an essential element" of a claim is grounds for dismissal under Rule 12(b)(6). *Schneider v. Pearson Educ., Inc.*, No. 12 CIV. 6392 JPO, 2013 WL 1386968, at *5 n.6 (S.D.N.Y. Apr. 5, 2013) (internal quotation marks and citations omitted). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006). But a court may consider "any 'written instrument' that is attached to [the complaint] as 'an exhibit,'" "incorporated in it by reference," or "integral to the complaint." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)). A pleading incorporates a document by reference where it makes "a clear, definite and substantial reference to the document[]." *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003)).

A Court may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). Federal Rule of Evidence 201(b) permits a court to take judicial notice of facts that are "not subject to reasonable dispute" because they (1) are

"generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "Under that rule, a 'Court may take judicial notice of pleadings filed in other cases in deciding a motion to dismiss without converting that motion into a motion for summary judgment.'" *McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*, 638 F. Supp. 3d 333, 338 (S.D.N.Y. 2022) (quoting *Ndremizara v. Swiss Re Am. Holding Corp.*, 93 F. Supp. 3d 301, 313 n.7 (S.D.N.Y. 2015)). "But a 'court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" *Id.* (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)).

Defendants' motion to dismiss is accompanied by the Declaration of Diana Sterk, which attaches seven exhibits. Exhibits 1 and 2 are "document[s] filed by the defendant" in a case that Plaintiffs brought in the Southern District of Florida. Sterk Decl. ¶¶ 3–4. The documents were submitted as certified translations of, respectively, "a concession granted in 1955 by the Cuban Government to Maritima Mariel S.A.," and "a resolution issued by the Cuban Government on August 19, 1960, confiscating the assets of Maritima Mariel S.A. and other companies." *Id.* Defendants invite the Court to consider these documents for the truth of their contents "because they are incorporated by reference in the complaint and because the complaint relies heavily on their undisputed terms and effect." *See* Mem. at 7 & n.3. In support of their request, Defendants argue that the exhibits were filed in a case "brought by the same Plaintiffs" as in this case, *id.*, though they were filed by a defendant who is not a party here. Defendants also argue that Plaintiffs quote from translations of the underlying concession and resolution "throughout the complaint." *Id.* It is clear that the underlying concession and resolution are incorporated by reference into the FAC, as the FAC relies heavily on them throughout the pleading to support Plaintiffs' confiscation and trafficking allegations. *See, e.g.*, FAC ¶¶ 2–4, 102–08, 115–19; *Trump v. Vance*, 977 F.3d 198, 210 (2d

Cir. 2020) (affirming finding of incorporation by reference of document where pleading "relie[d] heavily" on the document). But Plaintiffs did not quote from or rely on the particular translations that Defendants attach to their motion to dismiss. To the contrary, Plaintiffs dispute the authenticity of those translations. *See* Opp. at 32 & n.28 (arguing that the translations were "neither certified nor relied on by Plaintiffs in their pleading" because they were "prepared by a lawyer hired by the defendant in another case brought by Plaintiffs" and that lawyer "did not claim to be a certified translator []or disclose any actual qualifications as a translator"). "[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" before a district court may consider the document on a motion to dismiss. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). Accordingly, while the Court may judicially notice that these documents were filed in the case before the Southern District of Florida, the Court will not consider these documents for the truth of their contents. *See McKenzie-Morris*, 638 F. Supp. 3d at 338.

Exhibits 3, 4, and 5 to the Sterk Declaration are court orders from the same case before the Southern District of Florida. Sterk Decl. ¶¶ 5–7. The Court considers these documents in the same way that it would consider any case law from the Southern District of Florida.

Exhibits 6 and 7 to the Sterk Declaration are exhibits to the original complaint filed by Plaintiffs in this case. Sterk Decl. ¶¶ 8–9. The Court considers these documents in determining whether Plaintiffs' claims survive dismissal. "[E]ven though the Amended Complaint is the operative pleading, the Court may still credit admissions in the original complaint and attached exhibits." *Poindexter v. EMI Rec. Grp. Inc.*, No. 11 CIV. 559 LTS JLC, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012); *accord Fiorillo v. United Techs. Corp.*, No. 3:13-CV-1287 (VLB), 2015 WL 5797010, at *1 (D. Conn. Sept. 30, 2015) (similar, gathering cases).

### III.    DISCUSSION

Because "personal jurisdiction is a threshold determination that must precede [the] merits," *In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 268 (2d Cir. 2001) (citation omitted), the Court first addresses, and rejects, Defendants' motion under Rule 12(b)(2) to dismiss the claim against MSC Cargo for lack of personal jurisdiction.  The Court then turns to Defendants' motion under Rule 12(b)(6) to dismiss this action for failure to state a claim.  That motion is denied as to Ms. de Fernandez and granted as to all other plaintiffs.

#### a.    Personal Jurisdiction

Plaintiffs have made a prima facie showing of personal jurisdiction over both defendants. There is no dispute that the Court has general personal jurisdiction over MSC USA, because "MSC USA is incorporated and has its principal place of business in New York."  Mem. at 13 n.5; FAC ¶ 30; *see, e.g.*, *Maria*, 2024 WL 4350826, at *5.  The parties dispute only whether there is personal jurisdiction over MSC Cargo.  Mem. at 13 n.5; Opp. at 4.  Plaintiffs argue that the Court has specific personal jurisdiction[2] over MSC Cargo through the actions of MSC USA in New York.  Opp. at 4. Defendants contest only whether the exercise of specific personal jurisdiction would comport with due process.[3]  Mem. at 13.  Due process requires that MSC Cargo "purposefully directed [its] activities at the forum," that "the litigation arises out of or relates to those activities," and that "the assertion of personal jurisdiction would comport with fair play and substantial justice."  *In re del Valle*

---

[2] Plaintiffs do not argue that the Court has general personal jurisdiction over MSC Cargo, Opp. at 4, which is "organized under the laws of Switzerland with its principal place of business [in] Geneva," FAC ¶ 27.  *See, e.g.*, *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 628–29 (2d Cir. 2016) (noting that "when a corporation is neither incorporated nor maintains its principal place of business in a state, mere contacts, no matter how 'systematic and continuous,' are extraordinarily unlikely to add up to an 'exceptional case'" where there may nonetheless be general personal jurisdiction).

[3] Despite allegations in the FAC that MSC Cargo is subject to personal jurisdiction under New York's long-arm statute, N.Y. C.P.L.R. § 302(a), FAC ¶ 41, Defendants rest on their constitutional arguments and decline to separately address the applicability of New York's long-arm statute.  Mem. at 13 n.4.  The Court treats this as a concession that the statutory and constitutional jurisdictional analyses are equivalent for the purposes of this motion.  *See Sucesores de Don Carlos Nuñez y Dona Pura Galvez*, 2023 WL 2712505, at *6 n.8 (treating personal-jurisdiction argument as conceded because the plaintiffs failed to dispute it in their opposition brief); *In re UBS AG Sec. Litig.*, No. 07 CIV. 11225 RJS, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) (holding party had "concede[d] through silence" arguments raised by opposing party).

*Ruiz,* 939 F.3d 520, 529 (2d Cir. 2019) (internal quotation marks, citations, and alterations omitted). Defendants argue that the second element is not satisfied. Mem. at 13–17. The Court disagrees.

The FAC provides enough undisputed allegations of in-state, suit-specific conduct to meet Plaintiffs' prima facie burden at this stage. The Court may exercise "jurisdiction over a principal based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal.'" *Charles Schwab Corp. v. Bank of Am. Corp.,* 883 F.3d 68, 85 (2d Cir. 2018) (quoting *Bank Brussels,* 305 F.3d at 127). Plaintiffs allege at least five occasions between 2013 and 2019 where MSC Cargo, through MSC USA, sent cargo shipments from New York to the Port of Mariel.[4] FAC ¶ 54. Each of these shipments was governed by a "bill of lading" that expressly states that it is "[s]igned by [MSC USA] as Agent on behalf of the Carrier MSC Mediterranean Shipping Company S.A.," or "words to that effect."[5] *Id.* ¶ 52. Accordingly, Defendants "do[] not dispute that," with respect to these shipments, "MSC USA is [MSC Cargo's] agent or that MSC USA's actions may be imputable to it." Reply at 3; *see also* Sanford Decl. ¶ 7 ("The provision of MSC Cargo's transportation services in the United States is handled by a subsidiary, MSC USA.").[6]

---

[4] Plaintiffs also rely on actions taken in the United States but outside of New York, including hundreds of cargo shipments between Cuba and other states. *See, e.g.,* Opp. at 8 (highlighting cargo shipments between Cuba and other places in the United States), *id.* at 7 (highlighting allegations of advertisements from MSC Cargo elsewhere in the United States). The Court does not hold that actions taken outside of New York would confer specific personal jurisdiction over MSC Cargo. *See Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.,* 331 F. Supp. 3d 130, 144 (S.D.N.Y. 2018) (holding that *prima facie* showing of personal jurisdiction was not made where the alleged "conduct by [the third-party defendants] related to this lawsuit . . . took place in Colorado" rather than New York); *Bensusan Rest. Corp. v. King,* 126 F.3d 25, 29 (2d Cir. 1997) ("The acts giving rise to [this] lawsuit . . .were performed by persons physically present in Missouri and not in New York. Even if [the plaintiff] suffered injury in New York, that does not establish a tortious act in the state of New York.").

[5] Plaintiffs also argue that the bills of lading "are made expressly subject to New York law and jurisdiction." Opp. at 7 (citing FAC ¶¶ 50-52). The FAC does not actually allege this. *See* FAC ¶¶ 50-52 (allegations regarding language in bills of lading, none of which raise a choice-of-law or choice-of-jurisdiction provision). At most, the FAC alleges that MSC Cargo "routinely chooses to litigate disputes in this District" through language in its bills of lading, *id.* ¶ 76, and provides a generic set of bill-of-lading terms and conditions that include language to this effect, *id.* Ex. B. But the FAC does not allege that MSC Cargo's shipments between New York and Cuba contained such language.

[6] Plaintiffs also argue that because the Court has general jurisdiction over MSC USA, and because MSC USA is MSC Cargo's agent, the Court has jurisdiction over MSC Cargo through MSC USA's actions taken outside of New York. Opp. at 9. This argument confuses general and specific personal jurisdiction. To establish specific jurisdiction, Plaintiffs must allege concrete actions or conduct attributable to MSC Cargo that "create a substantial connection with [New

Ordinarily, the multiple shipments MSC Cargo made from New York to the Port of Mariel would suffice for the Court to exercise personal jurisdiction. Plaintiffs' claims "arise out of or relate to" MSC Cargo's contacts with New York if there is "an affiliation between [New York] and the underlying controversy, principally, an activity or an occurrence that takes place in [New York] and is therefore subject to [New York's] regulation." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359–60 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 582 U. S. 255, 262 (2017)) (alterations and internal quotation marks omitted). The Second Circuit has held that this affiliation "require[s] some causal relationship between an entity's in-forum contacts and the proceeding at issue." *In re del Valle Ruiz*, 939 F.3d at 530 (emphasis omitted).[7] The required causal relationship "depends on 'the relationship among the defendant, the forum, and the litigation.'" *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018) (quoting *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)).

MSC Cargo's shipments from New York to the allegedly confiscated property meet this standard. FAC ¶¶ 4, 143. MSC Cargo's use of and benefit from the Port of Mariel for its cargo business are a fundamental part of Plaintiffs' cause of action under the Act. *E.g.*, *id.* ¶ 54; *see* 22 U.S.C. § 6023(13)(A)(ii) (defining trafficking, in part, as engaging in "a commercial activity using or

---

York]." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Those forum-specific actions can be made through MSC USA, but the actions themselves, not the agent who makes them, must demonstrate a connection to New York. *See Oklahoma Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A. Institucion de Banca Multiple*, 92 F.4th 450, 458 (2d Cir. 2024) ("Once the brokers are established as Defendants' agents for jurisdictional purposes, the agents' *contacts* can be imputed to Defendants." (emphasis added) (internal quotation marks and citation omitted)).

[7] Plaintiffs argue that *In re del Valle Ruiz*'s causation requirement no longer controls, Opp. at 17, because the Supreme Court has since observed that it has "never framed the specific jurisdiction inquiry as always requiring proof of causation." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021). However, the Second Circuit has "cautioned District Courts against preemptively declaring that [Second Circuit] caselaw has been abrogated by intervening Supreme Court decisions." *Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 (2d Cir. 2024), *cert. denied sub nom. Raging Cap., LLC v. Packer*, No. 24-408, 2024 WL 4743106 (U.S. Nov. 12, 2024); *see also id.* at 54 n.36 (explaining that a district court can decline to follow Second Circuit precedent only in "rare cases" where "an intervening Supreme Court decision has so clearly undermined [Second Circuit] precedent that it will almost inevitably be overruled"). As explained *infra*, the facts here support a finding of specific personal jurisdiction even applying the causation requirement set forth in *In re del Valle Ruiz*, 939 F.3d at 530. Accordingly, the Court need not address whether a "causal relationship" is required for a finding of specific personal jurisdiction in this case. *Id.* (emphasis omitted).

otherwise benefiting from confiscated property"). That is true even if, as Defendants' affidavit

contends, the New-York-to-Cuba shipments were made by "transshipment," *i.e.*, by offloading

containers at "an intermediate port" and loading them onto a third-party vessel for shipment to

Cuba. Sanford Decl. ¶¶ 15, 19. As Defendants concede, MSC Cargo remained responsible for the

New York cargo until its discharge in Cuba, even when that cargo was on a ship owned by a third

party. *See id.* ¶ 15.[8] Accordingly, MSC Cargo's multiple New-York-to-Cuba shipments constitute

sufficient "in-state activity that gave rise to the episode-in-suit," *In re del Valle Ruiz,* 939 F.3d at 530

(quoting *Waldman*, 835 F.3d at 331, to support the exercise of specific personal jurisdiction at this

stage, *see Dorchester*, 722 F.3d at 84 ("[W]here a court relies on pleadings and affidavits, rather than

conducting a full-blown evidentiary hearing, the plaintiff need only make a *prima facie* showing that

the court possesses personal jurisdiction over the defendant" (internal quotation marks and citations

omitted)).

    Moreover, the New-York-to-Cuba shipments not time-barred for the purposes of this

motion. Defendants' principal argument is not that the New-York-to-Cuba shipments would not

ordinarily confer personal jurisdiction, but that they cannot support personal jurisdiction here

because they fall outside of the time period established by the Helms-Burton Act's statute of

repose.[9] *See* Mem. at 13. Section 6084 of the Act provides that "[a]n action under section 6082 . . .

---

[8] Defendants also argue that the shipments between New York and Cuba are not substantial contacts but rather "random, fortuitous, or attenuated contacts," Mem. at 15 (quoting *Laydon v. Mizuho Bank, Ltd.*, No. 12-CV-3419, 2015 WL 1515358, at *2 (S.D.N.Y. Mar. 31, 2015)), because the fact that cargo was loaded in New York is "irrelevant to what Plaintiffs allege is the wrongful conduct: calling upon the port of Mariel," *id.* The Court disagrees. A defendant that "'deliberately' has engaged in significant activities within a State" has not merely engaged in "'random,' 'fortuitous,' or 'attenuated' contacts" with that State. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985) (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984)). MSC Cargo intentionally shipped cargo from New York to the Port of Mariel on at least five occasions. FAC ¶¶ 143(h), 143(i), 143(p), 143(q), 143(r). That suffices, at this stage, for a prima facie showing that MSC Cargo "purposeful[ly] avail[ed]" itself of the forum of New York, and thus that it is "not be[ing] haled into a jurisdiction solely as a result of 'random,' fortuitous,' or 'attenuated' contacts." *Burger King*, 471 U.S. at 476 (quoting *Keeton*, 465 U.S. at 781).

[9] Section 6084 "runs from 'the defendant's last culpable act, not from the accrual of the claim." *Moreira v. Société Générale, S.A.*, 573 F. Supp. 3d 921, 931 (S.D.N.Y. 2021) (quoting *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2050 (2017)) (alterations omitted). "That alone is a 'close to dispositive indication that the statute is one of repose.'" *Id.*

may not be brought more than 2 years after the trafficking giving rise to the action has ceased to occur." 22 U.S.C. § 6084.  MSC Cargo did not cease shipments to the Port of Mariel until at least 2021, less than two years before this action was brought on July 25, 2022, FAC ¶ 143(j); Dkt. No. 1, but its last alleged shipment from New York to Cuba took place in 2019, more than two years prior, *id.* ¶ 143(r).  Moreover, Defendants' affirmation states, and Plaintiffs do not dispute, that MSC Cargo has not shipped any cargo between New York and the Port of Mariel since December 2019. Sanford Decl. ¶ 23.  Accordingly, Defendants argue that the New York-to-Cuba shipments are time-barred, and that "[s]pecific jurisdiction cannot be predicated on time-barred contacts with a forum." Mem. at 13.  The Court disagrees.

The shipments are not time-barred from consideration on this motion because, "construing all pleadings and affidavits in the light most favorable to [Plaintiffs]," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673, MSC Cargo continuously trafficked in confiscated property until at least 2021, rather than committing a series of isolated violations.  22 U.S.C. § 6084 (preventing actions brought more than two years "after the trafficking giving rise to the action has ceased to occur").  While "trafficking" under the Helms-Burton Act can, as Defendants argue, consist of isolated acts or transactions, Mem. at 44, "trafficking" also includes continuous engagement in "a regular course of conduct" using or otherwise benefiting from confiscated property.  22 U.S.C. § 6023(13)(A)(ii); 28 U.S.C. § 1603(d).  Section 6023 defines "trafficking," among other things, as "knowingly and intentionally" "engag[ing] in a commercial activity using or otherwise benefiting from confiscated property."  22 U.S.C. § 6023(13)(A)(ii).  It gives "commercial activity" "the meaning given that term in section 1603(d) of title 28."  22 U.S.C. § 6023(3).  Section 1603(d), in turn, defines "commercial

(quoting *Cal. Pub.*, 137 S. Ct. at 2050) (noting additional reasons why "Section 6084 is more naturally read to be a statute of repose").

activity" as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).

It follows from the language in Section 1603(d) that a defendant's "ongoing violation of the Helms-Burton Act" can constitute a single instance of trafficking.  *See Sucesores de Don Carlos Nunez*, 2023 WL 2712505, at *6.  A "regular course of conduct" encompasses conduct that recurs or happens often.  *Regular* 2a, Merriam-Webster, https://www.merriam-webster.com/dictionary/regular; *Regular* 2, Collins English Dictionary, https://www.collinsdictionary.com/us/dictionary/english/regular.  Moreover, Congress contrasted "regular course of conduct" with the "single act[s]" on the other side of the "or" in Section 1603(d).  *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992) (observing that, under Section 1603(d), the commercial nature of an activity does not "depend upon whether it is a single act or a regular course of conduct").  "[T]erms connected by a disjunctive" are ordinarily "given separate meanings," *United States v. Harris*, 838 F.3d 98, 105 (2d Cir. 2016) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)); *accord Loughrin v. United States*, 573 U.S. 351, 357 (2014) (noting that Congress's use of "or" indicates that "the words it connects are to be given separate meanings"), indicating that "regular course of conduct" encompasses ongoing, rather than singular, acts of trafficking.  *See Weltover*, 504 U.S. at 612.

The structure of Section 6023(13)(A) is further proof that ongoing conduct can constitute a single instance of trafficking under the Helms-Burton Act.  Section 6023(13)(A)(i) defines discrete acts of trafficking, including sales, transfers, distributions, and purchases.  22 U.S.C. § 6023(13)(A)(i).  Section 6023(13)(A)(ii), by contrast, defines trafficking as "engag[ing] in a commercial activity using or otherwise benefiting from confiscated property."  22 U.S.C. § 6023(13)(A)(ii).  The broad language in Section 6023(13)(A)(ii), which is separated from Section 6023(13)(A)(i) by an "or,"

plainly encompasses continuing violations, and is best read as doing so in order to have "separate meaning[]" from Section 6023(13)(A)(i). *Loughrin*, 573 U.S. at 357.

Here, Plaintiffs have plausibly alleged that MSC Cargo engaged in a single "regular course of commercial conduct" "using or otherwise benefiting from confiscated property." 22 U.S.C. § 6023(13)(A)(ii); 28 U.S.C. § 1603(d). That single instance of trafficking did not "cease[] to occur" until 2021, less than two years before Plaintiffs brought this action. 22 U.S.C. § 6084; FAC ¶ 143. MSC Cargo is alleged to have "use[d], benefit[ed], and profit[ed] from the" "Confiscated Property" by regularly shipping and unloading its cargo on the same confiscated land. FAC ¶ 180. The FAC alleges that, "since 2016, [MSC Cargo] contracted to serve as the carrier for approximately 273 cargo shipments from various U.S. Ports, including multiple cargo shipments from the Port of New York . . . to the Port of Mariel." FAC ¶ 50. These recurring shipments plausibly comprised a single, "regular course of commercial conduct" through which MSC Cargo made use of or otherwise benefited from the Port of Mariel. 28 U.S.C. § 1603(d). Indeed, the FAC sweeps all of those shipments under a single cause of action for trafficking under the Helms-Burton Act. FAC at 54. Accordingly, at this stage, MSC Cargo's New York shipments cannot be isolated from the rest of its conduct and removed from the Court's personal jurisdiction analysis.[10]

---

[10] Plaintiffs argue, in the alternative, that the Court may exercise personal jurisdiction under Fed. R. Civ. P. 4(k)(2), Opp. at 17, which provides for "personal jurisdiction over a defendant if . . . the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and . . . exercising jurisdiction is consistent with the United States Constitution and laws." Because the Court finds that it may exercise personal jurisdiction over MSC Cargo pursuant to N.Y. C.P.L.R. 302(a), the Court need not address whether it may also exercise personal jurisdiction pursuant to Rule 4(k)(2). The Court notes, however, that "[i]n this Circuit, to meet the second requirement of Rule 4(k)(2), plaintiffs need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state." *Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 125 (S.D.N.Y. 2020) (gathering cases). "Plaintiffs have not certified that [MSC Cargo is] not subject to jurisdiction in any other state." *TAGC Mgmt., LLC v. Lehman*, No. 10 CIV. 06563 RJH, 2011 WL 3796350, at *6 (S.D.N.Y. Aug. 24, 2011) (quoting *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 731 (S.D.N.Y. 2010)). Plaintiffs' argument that they do not need to provide a certification because "the Second Circuit has not decided the issue" and they are "confident that, when confronted with it, the Second Circuit will . . . not require Plaintiffs to certify," Opp. at 19 (emphasis omitted), is not well taken, especially given Plaintiffs' acknowledgement of the district-court practice in this District of requiring a certification, *id.* at 18–19 & n.18 (citing two S.D.N.Y. cases requiring certification and citing no cases to the contrary). Moreover, as Defendants point out, Plaintiffs argued in a previous case that MSC Cargo was subject to jurisdiction in the Southern District of Florida. Mem. at 17 n.6. That argument plainly contradicts Plaintiffs' argument that Rule 4(k)(2) should apply here.

Defendants' Rule 12(b)(2) motion to dismiss Plaintiffs' claims against MSC Cargo is therefore denied.[11]

### b. The Estate and Inheritor Plaintiffs Fail to State a Claim under the Helms-Burton Act

Turning now to Defendants' Rule 12(b)(6) motion for failure to state a claim:  none of the Estate and Inheritor Plaintiffs acquired ownership of their alleged claims in time to bring suit under the Act.  Section 6082(a)(4) of the Act provides that, "[i]n the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996."  22 U.S.C. § 6082(a)(4)(B).  There is no dispute that the subject properties were confiscated before March 12, 1996.  *See, e.g.*, FAC ¶ 5 ("[T]he Cuban Government confiscated [Plaintiffs'] Property in 1960."); Mem. at 1.  There is also no dispute that each of the deceased Blanco Rosell Siblings—*i.e.*, every sibling except for Ms. de Fernandez—died after March 12, 1996.  FAC ¶¶ 10–13; Mem. at 10.  Despite this, Plaintiffs argue that the deceased Blanco Rosell Siblings' estates can bring their claims under the Act, Opp. at 47–51, or, if not, that their inheritors can bring the claims, *id.* at 51–52.

None of them can bring suit under the Act, because the estates and inheritors "acquired" their claims upon the deaths of the deceased Blanco Rosell Siblings, and those deaths occurred after the Act's deadline to "acquire[] ownership of the claim."  22 U.S.C. § 6082(a)(4)(B).  The Estate Plaintiffs "acquired" their claims when the deceased Blanco Rosell Siblings died because, under

---

[11] Section 6084 bars actions brought more than two years after "the trafficking giving rise to the action has ceased to occur," but does not bar liability for any portion of that trafficking so long as the action is timely.  22 U.S.C. § 6084. That is true even if parts of the trafficking giving rise to the action occurred more than two years before the action is brought.  *See Havana Docks Corp. v. Carnival Corp.*, No. 19-CV-21724, 2020 WL 5517590, at *11 (S.D. Fla. Sept. 14, 2020) (holding, at the motion-to-dismiss stage, that the defendant had continuously trafficked in confiscated Cuban property by operating cruises there, and "reject[ing] the notion that [the plaintiff's] single-count [complaint] is actionable only as to certain allegations but not as to others").  Accordingly, the Court does not hold, at this stage, that Defendants can only be liable for shipments that occurred within two years of the filing of this suit.

Florida law, the event of the siblings' deaths meant that "their assets became the property of their respective estates and no longer belonged to them individually." *de Fernandez v. Seaboard Marine, Ltd.*, No. 20-CV-25176, 2021 WL 3173213, at *9 (S.D. Fla. July 27, 2021); *accord Sharps v. Sharps*, 214 So. 2d 492, 495 (Fla. Dist. Ct. App. 1968) ("Upon his death . . . [the husband's] check became an asset of the husband's estate."); *see also* Fla. Stat. § 732.101(2) ("The decedent's death is the event that vests the heirs' right to the decedent's intestate property."). It makes no difference that, as Plaintiffs argue, "a decedent's 'personal representative . . . stands in [the decedent's] shoes.'" Opp. at 47 (quoting *Sullivan v. Sessions*, 80 So. 2d 706, 707 (Fla. 1955)) (alteration in original). As Plaintiffs' own cases explain, that principle defines the rights of the estate's representative.[12] It does not address the distinction between a decedent and her estate. *See Sullivan*, 80 So. 2d at 707 ("[T]he personal representative simply 'stands in [the decedent's] shoes' and can have no greater rights than she would have had during her lifetime."); *Magwood v. Tate*, 835 So. 2d 1241, 1243 (Fla. Dist. Ct. App. 2003) ("[A] personal representative of an estate stands in the shoes of the decedent, so a person has no greater rights against the estate than the person would have had against the decedent during his lifetime."). Accordingly, because the Plaintiff Estates did not acquire their claims to the confiscated property until after March 12, 1996, FAC ¶¶ 10–13, their claims must be dismissed. 22 U.S.C. § 6082(a)(4)(B).

The Inheritor Plaintiffs' claims are barred for similar reasons. Again, where the confiscation occurred before March 12, 1996, no United States national may bring an action "unless *such* national acquires ownership of the claim before March 12, 1996. 22 U.S.C. § 6082(a)(4)(B) (emphasis added).

---

[12] Plaintiffs also quote a Florida appellate court's statement that "the estate assets are not the personal representative's property." Opp. at 49 (quoting *State v. Lahurd*, 632 So. 2d 1101, 1103 (Fla. Dist. Ct. App. 1994)) (emphasis omitted). What the personal representative owns is beside the point. What matters for purposes of Section 6023(a)(4)(B) is that, as that opinion explains, "it is the estate and beneficiaries who have an interest in the [estate] assets," not the deceased. *Lahurd*, 632 So. 2d at 1103; *see also Blechman v. Est. of Blechman*, 160 So. 3d 152, 157 (Fla. Dist. Ct. App. 2015) ("The Florida Probate Code broadly defines the probate 'estate' as encompassing the decedent's property 'that is the subject of administration.' . . . [i]f the subject property will pass either intestate or by way of will, then it is part of the decedent's probate estate." (quoting Fla. Stat. § 731.201)). The estate must, therefore, have acquired the deceased's assets.

The "statute is . . . clear that the United States national who acquired the ownership of the claim must be the same United States national who brings the action, not the predecessor of the United States national who brings the action." *Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316, 328 (D. Del. 2021), *aff'd*, No. 21-1842, 2022 WL 3538221 (3d Cir. Aug. 18, 2022). There is no exception to this rule for inheritors. And, reasonably, Plaintiffs do not argue that inheritance does not constitute an acquisition for purposes of the Act. *See* Opp. at 51–52. Accordingly, because each of the deceased Blanco Rosell siblings died after March 12, 1996, the Inheritor Plaintiffs "acquired" their claims after the statutory cutoff. *See de Fernandez*, 2021 WL 3173213, at *8 & n.7 (gathering cases).

For these reasons, the Estate Plaintiffs and the Inheritor Plaintiffs fail to state a claim.[13]

### c. Ms. Fernandez States a Claim under the Act

Unlike the other plaintiffs, Ms. de Fernandez ("Plaintiff") states a claim under the Act. Ms. de Fernandez acquired her alleged claim in 1960, before the statutory cutoff date. FAC ¶ 9. Moreover, the Court finds that she has adequately pleaded ownership of that claim, that she can bring a claim despite being a Cuban national when her property was confiscated, and that she has plausibly alleged the elements of "trafficking" provided in the Act. Defendants' motion to dismiss Ms. de Fernandez's claim under Rule 12(b)(6) is therefore denied.

### i. Ms. de Fernandez Plausibly Alleges that She Owns a "Claim" to Confiscated Property under the Helms-Burton Act

Ms. de Fernandez has adequately pleaded ownership of a "claim" under the Act based on her shareholdership in confiscated companies whose properties were the subject of trafficking. *E.g.*, FAC ¶ 2 (alleging confiscation of plaintiffs' wholly owned companies, which owned land on Mariel Bay). Section 6082(a)(1)(A) provides a cause of action to a plaintiff "who owns the claim" to "property which was confiscated by the Cuban Government on or after January 1, 1959." 22 U.S.C.

---

[13] Because the Court finds that the Estate and Inheritor Plaintiffs' claims fail on the merits, the Court does not reach Defendants' alternative argument that those plaintiffs' claims are barred by collateral estoppel. Mem. at 43.

§ 6082(a)(1)(A).  Plaintiff alleges ownership of "the claim" to the confiscated land on Mariel Bay through her shares in several closely held companies that owned the land prior to its confiscation. FAC ¶¶ 4, 102.  Defendants argue that Plaintiff has no "claim" to the companies' property because of the principle in corporate law that "[s]hareholders do not hold legal title to any of the corporation's assets."  Mem. at 18 (quoting *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 476 (2d Cir. 2007)); *see also id.* (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) ("An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets.")).

Defendant is correct that Plaintiff did not directly own the confiscated land, but Plaintiff's lack of direct ownership is not grounds for dismissal at this stage.  The Helms-Burton Act does not require plaintiffs to allege ownership, legal or otherwise, of confiscated property.  It requires plaintiffs to allege ownership of "the claim" to confiscated property, 22 U.S.C. § 6082(a)(1)(A), or perhaps merely "a claim" to confiscated property, *id.* § 6082(4)(B); 22 U.S.C. § 6023(13)(A).[14]  So, while Plaintiff's ownership of the confiscated land might have been *sufficient* to state a claim under the Act, it was not necessary.  To hold otherwise "would require the Court to delete the word 'claim' from the phrase 'owns the claim to such property,' and effectively rewrite Helms-Burton to cover only those plaintiffs who 'own such property.'"  *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1290 (S.D. Fla. 2019); *accord Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) ("[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant").

---

[14] The Helms-Burton Act refers to ownership of "the claim" to confiscated property when setting out its private cause of action.  22 U.S.C. § 6082(a)(1)(A).  However, the Act elsewhere refers to "a claim" to confiscated property, for example in the section defining the "Applicability" of the cause of action.  22 U.S.C. § 6082(a)(4)(B) (defining when a plaintiff may "bring an action under this section on a claim to the confiscated property"); 22 U.S.C. § 6082(a)(4)(C) (same); *see also* 22 U.S.C. § 6023(13)(A) (defining "traffics" with reference to actions taken "without the authorization of a United States national who holds a claim to the property").  Defendants do not argue that this has any significance. The Court declines to do so on their behalf.  *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *11 (accepting point that party "concede[d] through silence").

Accordingly, the Court asks whether Plaintiff has adequately pleaded ownership of "the *claim* to the confiscated property." 22 U.S.C. § 6082(a)(1)(A). The Helms-Burton Act does not define the term "claim," so the Court looks to the term's "ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). "Based on contemporary dictionary definitions, Congress would have understood that a claim to confiscated property is substantially broader than a direct interest in such property." *Garcia-Bengochea*, 407 F. Supp. 3d at 1289 (emphasis omitted). For example, Merriam-Webster's Collegiate Dictionary defined "claim" as "a demand for something due or believed to be due," "a right to something," or "an assertion open to challenge." *Merriam-Webster's Collegiate Dictionary* 210 (10th ed. 1993). And Webster's New World College Dictionary defined "claim" as "a demand for something rightfully or allegedly due" or "a right or title to something." *Webster's New World College Dictionary* 257 (3d ed. 1996). The bar to plead a "demand" or "right" to the confiscated property is clearly lower than the bar to plead ownership of it.

Under these standards, Plaintiff's allegations suffice to plead a "claim" to the confiscated property. 22 U.S.C. § 6082(a)(1)(A). Plaintiff allegedly owned shares in several companies which owned, among other things, "extensive land holdings" around Mariel Bay. FAC ¶¶ 4–5. The Cuban government confiscated those companies, and the land they owned, in 1960. *Id.* ¶ 5. Moreover, while Plaintiff was a minority stakeholder in the companies, her stakes were not insignificant. The companies were "wholly owned" "in equal parts" between her and her four siblings. *Id.* ¶¶ 102, 109. As another court has already held, Plaintiff's allegations suffice to plead "a claim to the confiscated property through her stake in the companies." *de Fernandez*, 2022 WL 3577078, at *6. Whether Plaintiff will be able to prove her ownership of the claim at trial will depend on fact-intensive issues like whether the confiscated companies still exist, and, if not, the effect their dissolution has on the viability of Plaintiff's alleged claim. The extent to which the statute embodies a Congressional intent

to "preserve corporate formalities," as Defendants argue, may also play a role in answering such questions. Mem. at 18. But that cannot be done on a motion to dismiss. *See Hu v. City of New York*, 927 F.3d 81, 97 (2d Cir. 2019) (noting "fact-intensive" determinations are inappropriate on a motion to dismiss).

Accordingly, Plaintiff has plausibly pleaded ownership a claim to confiscated property based on her shareholdership in the confiscated companies.

> ### ii. Claimants Need Not Be United States Nationals at the Time of the Confiscation of Their Property to State a Claim Under the Helms-Burton Act

That Ms. de Fernandez only became a U.S. national after the Cuban government confiscated her property, FAC ¶¶ 5, 9–26, does not preclude her claim under the Act. Section 6082(a)(1)(A), the Act's operative cause-of-action provision, provides that traffickers of confiscated property "shall be liable to any United States national who owns the claim to such property." 22 U.S.C. § 6082(a)(1)(A). It provides no limitation on the U.S. nationals to whom liability is owed, so long as the U.S. national presently "owns the claim." *Id.*[15] Had Congress intended to require claimants to be U.S. nationals at the time of confiscation, Congress could easily have done so. But it did not. *See Winegard v. Newsday LLC*, 556 F. Supp. 3d 173, 177 (E.D.N.Y. 2021) (declining to read into statute language that "Congress could easily have" included).

Despite the unambiguous text in the Act's operative clause, Defendants argue that the Act "does not apply" when "the property in question was allegedly confiscated from . . . Cuban citizens." Mem. at 19. Defendants' argument relies on language in the Act's "Purposes" and "Findings" sections, 22 U.S.C. § 6023 ("Purposes"); 22 U.S.C. § 6081 ("Findings"), which they argue "ma[k]e clear that the Helms-Burton Act is focused on property confiscated from 'United States

---

[15] Moreover, 22 U.S.C. § 6023(15) defines "United States national," in relevant part, simply as "any United States citizen." Again, the definition does not limit U.S. nationals to those who were U.S. citizens when their property was confiscated.

nationals.'" Mem. at 20. At least two courts in the Eleventh Circuit have come to similar conclusions. *Regueiro v. Am. Airlines, Inc.*, No. 19-CV-23965-JEM, 2022 WL 2399748, at *6 (S.D. Fla. May 20, 2022), *report and recommendation adopted in relevant part*, No. 19-23965-CIV, 2022 WL 2352414 (S.D. Fla. June 30, 2022) (holding that the Act's "Findings" section compels a reading of its cause-of-action provision as limited to claimants who were U.S. nationals at the time of confiscation); *Glen v. Club Méditerranée*, *S.A.*, 450 F.3d 1251, 1255 n.3 (11th Cir. 2006) (proffering, in dicta, that "property . . . owned by Cuban nationals at the time of its expropriation . . . may not be the proper subject of a trafficking claim under the [Helms-Burton Act]," citing the Act's "Findings" section). The Court disagrees.

To start, the Act's "purposes" and "findings" sections are not bases to depart from its unambiguous cause-of-action clause. While purpose and findings provisions may be a "'permissible indicator' of a statute's meaning," they "by their nature cannot override a statute's operative language." *Sturgeon v. Frost*, 587 U.S. 28, 57 (2019) (quoting A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 220 (2012)) (alterations omitted); *see also Fernandez v. CMA CGM S.A.*, 683 F. Supp. 3d 1309, 1325 (S.D. Fla. 2023) ("[T]he findings in a statute . . . do[] not limit or expand the scope of the operative clause of a statute." (citing Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 217 (2012) (other citations omitted)). That is because "[w]here the text of a clause itself indicates that it does not have operative effect, . . . a court has no license to make it do what it was not designed to do." *Hawaii v. Off. of Hawaiian Affs.*, 556 U.S. 163, 175 (2009) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 578, n.3 (2008)). Section 6082(a)(1)(A) is the Act's operative clause, since it provides the Act's cause of action. Because Section 6082(a)(1)(A) is unambiguous, Defendants cannot rely on the Act's purposes and findings to alter its meaning. *See id.*

Moreover, in any event, the Act's purposes and findings sections are not inconsistent with the text of Section 6082. Defendants, and the cases they rely on, make too much of language from those sections that focuses on "the theft of property from United States nationals" without mentioning Cuban nationals, 22 U.S.C. § 6022(3); *see also, e.g.*, 22 U.S.C. § 6081(2) (noting "[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government"); 22 U.S.C. § 6081(6)(B) (noting United States foreign policy of "protect[ing] the claims of United States nationals who had property wrongfully confiscated by the Cuban Government"). *Regueiro*, 2022 WL 2399748, at *6; *Glen*, 450 F.3d at 1255 n.3. Other language in the same provisions demonstrates that Congress was concerned with broader goals beyond protecting the property of U.S. nationals—goals that are clearly advanced by broader application of the statute. For example, the Act's purposes section expressly states the goal of "assist[ing] the Cuban people in regaining their freedom and prosperity." 22 U.S.C. § 6022(1). And Congress's findings state broadly that "United States nationals who were victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11). "Plaintiffs who only became United States citizens after their property was seized are clearly still 'United States nationals who were the victims of . . . Castro's wrongful seizures.'" *Fernandez*, 683 F. Supp. 3d at 1325.

In fact, limiting Helms-Burton Act claims to plaintiffs who were United States citizens when their property was confiscated would be inconsistent with the purposes of the Act. One of the Act's stated purposes is to impose on the Cuban regime "the pressure of a general economic embargo." 22 U.S.C. § 6081(6)(A). That purpose is served by expanding the cause of action in Section 6082, not limiting it. An embargo limited to trafficking in property originally owned by U.S. nationals alone would not be a "general embargo." Moreover, Section 6081(3)(B)(iii) of the Act expressly recognizes, in addition to the United States nationals victimized by the Cuban regime, the

"thousands more Cubans who claimed asylum in the United States as refugees because of persecution *and later became naturalized citizens of the United States*." 22 U.S.C. § 6081(3)(B)(iii) (emphasis added). Section 6081(3)(B)(iii) closely tracks the story of the Blanco Rosell Siblings as alleged in the FAC. Each were Cuban nationals, FAC ¶ 5, whose property the Cuban Government confiscated after a pretextual investigation, *id.* ¶¶ 2–3, who subsequently "fled Cuba after the confiscation and became U.S. citizens," *id.* ¶ 5, and who later became "naturalized U.S. citizen[s]," *id.* ¶¶ 9–13. Using the purposes section of the Act to bar the Blanco Rosell Siblings' cause of action because they only "later became naturalized citizens of the United States," 22 U.S.C. § 6081(3)(B)(iii), would be difficult, if not impossible, to square with Section 6081(3)(B)(iii). Accordingly, though the Court need not consider the Act's findings and purposes sections, *see Hawai'i*, 556 U.S. at 175, the Court is nonetheless satisfied that its "reading of the operative clause is consistent with the announced purpose" of the Act. *Heller*, 554 U.S. at 578; *Fernandez*, 683 F. Supp. 3d at 1325.

For these reasons, Plaintiff, who was a U.S. national when she brought this action, FAC ¶ 9, may state a claim under the Helms-Burton Act despite not becoming a United States citizen until after the Cuban Government confiscated her property.

### iii. Ms. de Fernandez Plausibly Alleges the Non-Scienter Elements of Trafficking under the Helms-Burton Act

Plaintiff also adequately pleads the non-scienter elements of trafficking, because she adequately pleads that Defendants "engage[d] in a commercial activity using or otherwise benefiting from [the] confiscated property," 22 U.S.C. § 6023(13)(A)(ii),[16] "without the authorization of" Plaintiffs, 22 U.S.C. § 6023(13)(A). Among other things, Plaintiff alleges that Defendants' cargo

---

[16] Because the FAC plausibly alleges that Defendants' conduct meets the standard provided in 22 U.S.C. § 6023(13)(A)(ii), the Court does not address whether Defendants' conduct also meets the standard provided in 22 U.S.C. § 6023(13)(A)(iii). Mem. at 25–28; Opp. at 33–36. Defendants' conduct only needs to meet one of the three categories of trafficking provided in Section 6023(13)(A) to constitute trafficking, because the categories are disjunctive. *See* 22 U.S.C. § 6023(13)(A).

containers are "unloaded and stored" at the Logistics Facility and an adjacent container yard, both of which were "built entirely on the Confiscated Property." FAC ¶¶ 127, 140. Moreover, whenever Defendants' cargo is delivered inland to Cuba, it is delivered through a portion of the Container Terminal that is located on allegedly confiscated land, *id.* ¶ 141, and is "transported using road and rail over Confiscated Property," *id.* ¶¶ 61, 140.

These are plainly "commercial activit[ies]" that "us[e] or benefit[] from confiscated property." 22 U.S.C. § 6023(13)(A)(ii). Defendants are commercial shipping companies, and their cargo shipments to Cuba are commercial endeavors. *See* FAC ¶¶ 27–31, 136. Defendants allegedly provided "door-to-door shipping solutions" that shipped cargo using a network of storage amenities and logistics operations built on the confiscated land, *id.* ¶¶ 60–61,[17] and that transported cargo directly over the confiscated land, *id.* ¶¶ 126, 140–41. Those operations used and also benefited from the confiscated land. 22 U.S.C. § 6023(13)(A)(ii). As several courts have already held, that is sufficient to plead that Defendants trafficked in Plaintiffs' confiscated property. *See de Fernandez v. Crowley Holdings, Inc.*, 593 F. Supp. 3d 1162, 1171 (S.D. Fla. 2022) (holding that cargo company's shipments and storage on port infrastructure built on the same confiscated land constituted "commercial activity using or otherwise benefiting from confiscated property"); *de Fernandez*, 2021 WL 3173213, at *5–6 (same).

Defendants' contrary arguments misread the statute. Defendants first argue that "Congress's decision to put the word 'otherwise in front of the word 'benefiting,'" Mem. at 23–24, in the phrase "commercial activity using or otherwise benefiting from confiscated property," 22 U.S.C. § 6023(13)(A)(ii), "makes clear that any 'benefit[]' must be as directly tied to the confiscated property

---

[17] Defendants argue that its cargo vessels remained "at the water's edge" of the part of the Container Terminal that does not lie on confiscated land. Mem. at 22. Defendants do not support this contention with content from within, or incorporated into, the pleadings. *See id.* at 22–23. Arguments predicated on matters outside the four corners of the pleadings are not properly considered on a motion to dismiss. *See, e.g.*, *Field Day*, 463 F.3d at 192. In any event, as discussed, Defendants are alleged to have benefited from much more than just the "water's edge" of the bay.

as its 'us[e]' would be."  Mem. at 23–24.  Defendants argue that the term "benefiting from," so limited, cannot encompass their alleged conduct because Defendants' benefit from the land it too attenuated.  *See id.* at 24.  Their benefit, they argue, comes from facilities and services built on the land only after it was confiscated, rather than directly from the confiscated land itself.  *See id.*  The Court disagrees.

To start, drawing all reasonable inferences in Plaintiff's favor, Defendants' door-to-door shipments used the confiscated property, so the limits that the word "using" places on the term "otherwise benefiting from" in Section 6023(13)(A)(ii), Mem. at 23–24, are beside the point.  "The ordinary or natural meaning of 'use' is variously defined as 'to convert to one's service, 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.'"  *Dubin v. United States*, 599 U.S. 110, 118 (2023) (quoting *Bailey v. United States*, 516 U.S. 137, 143 (1995)) (internal quotation marks omitted).  Defendants' "interaction with the confiscated property," Mem. at 24, meets all of these definitions.  For example, Defendants are alleged to have availed themselves of the confiscated land by storing their cargo in an "empty container storage yard" within the confiscated property, FAC ¶ 113, and carried out a commercial purpose by means of the confiscated land by transporting cargo over the land to ensure that the cargo made it all the way "to [a] customer's door," *id.* ¶ 57. Indeed, as alleged, Defendants' "door-to-door shipping solutions" required the confiscated land to function.  *Id.* ¶ 62 (alleging that Defendants' "shipping business to the Port of Mariel would not be possible or profitable without the ability to use . . . all the physical areas and services . . . in the Port of Mariel").  Because Defendants' commercial activities used the land, they meet the elements of "trafficking" set forth in Section 6023(13)(A)(ii) (". . . engages in a commercial activity using or otherwise benefiting from confiscated property . . .").

In any event, even if Defendants did not "us[e]" the confiscated land, Defendants did "benefit[] from" it.  22 U.S.C. § 6023(13)(A)(ii).  Defendants are not wrong that the term "benefiting

from" should be read in the context of its "surrounding words" and the "placement of the [full] provision within" the Helms-Burton Act. *Yates v. United States*, 574 U.S. 528, 536 (2015). So, Defendants are not wrong that "benefiting from" in the phrase "using or otherwise benefiting from," 22 U.S.C. § 6023(13)(A)(ii), will relate more to "using" than it might in isolation. But that does not mean, as Defendants argue, that "the word 'otherwise' in front of the word 'benefiting'" means that "any 'benefit[]' must be as directly tied to the confiscated property as its 'us[e]' would be." Opp. at 23–24. To the contrary, the word "otherwise" ensures that the term "benefiting from" "cover[s] some set of 'matters not specifically contemplated'" by the word "using." *See Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024) (quoting *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009).[18] "'Otherwise' means 'in a different way or manner,' thus signaling a shift in emphasis . . . to the consequences of [a defendant's] actions." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 535 (2015) (quoting Webster's Third New International Dictionary 1598 (1971)).[19]

Here, the term "or otherwise benefiting from" in Section 6023(13)(A)(ii) easily captures Defendants' alleged conduct. A defendant "benefits" from something if that thing is "useful or profitable to" the defendant. *Benefit*, Merriam-Webster, https://www.merriam-

---

[18] The one case that Defendants rely on, *In re Bush Terminal Co.*, provides a similar explanation of the word "otherwise." 93 F.2d 659, 660 (2d Cir. 1938). Defendants quote a passage where the court concluded that "the words 'other' or 'any other' . . . ought to be read as 'other such like,'" Opp. at 24, but the Second Circuit later noted that, in other contexts, "the words 'or otherwise'"—*i.e.*, the words at issue here—demonstrated Congress's "inten[tion] to *remove* the limitation previously existing." *In re Bush Terminal*, 93 F.2d at 660 (emphasis added).

[19] Defendants also argue that the structure of Section 6023(13)(A) indicates that Section 6023(13)(A)(ii) can only encompass "direct interaction with the confiscated property" because the first two clauses in Section 6023(13)(A) cover "direct" trafficking "while indirect trafficking is covered exclusively by the . . . third clause." Opp. at 24. Defendants' argument is misplaced. The third clause provides that a person "'traffics' in confiscated property if that person . . . causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person." 22 U.S.C. § 6023(13)(A)(iii). The third clause is "indirect" only in the sense that it captures conduct done "through another person." It is not "indirect" in the sense that it covers "interaction with the confiscated property" of a different character than in the first two clauses. Opp. at 24. The "interaction with the confiscated property" in the third clause is, by its plain terms, exactly the same as in the first two clauses. *See* 22 U.S.C. § 6023(13)(A)(iii) (referring to "trafficking . . . as described in clause (i) or (ii)).

webster.com/dictionary/benefit.  Plaintiff's confiscated land is alleged to have been profitable to Defendants because the land, and the infrastructure built upon it, enabled Defendants to carry out their "door-to-door" commercial shipping operation.  FAC ¶¶ 60, 57.  Put differently, "the consequences of [Defendants'] actions," *Inclusive Communities Project*, 576 U.S. at 535, were, according to the FAC, that they "profit[ed] from" the confiscated land in conducting their door-to-door shipping business, at a minimum when they made deliveries through the confiscated land to customers in inland Cuba, FAC ¶ 74.

Nor are those benefits too attenuated from the confiscated land to fall within the ambit of the Act.  Defendants argue that their gains from the confiscated land rest on an "extended chain of benefits" which, if held to fall within Section 6023(13)(A)(ii), would require a definition of "benefiting" that includes "any sort of benefit derived from a confiscated property, no matter how indirectly or tangentially."  Opp. at 24.  But the chain of benefits in this case is not so "extended."  As discussed *supra*, Defendants are alleged to have benefited directly from the confiscated land itself when, among other things, they transported goods to customers in inland Cuba, FAC ¶ 57, and when they stored cargo in "an empty container storage yard" on the confiscated land, *id.* ¶ 113.  Moreover, Defendants' benefits from the port facilities built on the confiscated land, *see, e.g., id.* ¶ 127, are only a minor step removed.  Defendants are alleged to have made direct use of those facilities every time that they called at the Port of Mariel.  As the FAC points out, Defendants "could not conduct their shipping business without their use of these facilities."  *Id.* ¶ 113.  At this stage, it is reasonable to infer that a party "benefit[s]" from land if it makes copious use of the facilities built on that land.  *See* 22 U.S.C. § 6023(13)(A)(ii).[20]

[20] Besides the confiscated land, Defendants also argue that Plaintiffs fail to adequately plead trafficking in the 1955 Concession.  Mem. at 21–22.  Part of Defendants' argument is that Plaintiffs are collaterally estopped from alleging trafficking in the 1955 Concession because they "already litigated and lost on that exact issue" in a prior case, *de Fernandez*, 2022 WL 3577078.  Mem. at 28–31.  The court in that case found, on summary judgment, that the geographic scope of the 1955 Concession was limited to the east side of Mariel Bay, and thus "to the extent that [Ms. de Fernandez's] claims rest on the allegation that [the defendant] trafficked in the Container Terminal, which is located on

Accordingly, Ms. de Fernandez has adequately pleaded the non-scienter elements of "trafficking" as defined in the Helms-Burton Act.

### iv.   Ms. de Fernandez Has Adequately Pleaded Scienter

Ms. de Fernandez has also adequately pleaded the scienter element of "trafficking" under the Act. Defendants must "knowingly and intentionally" engage in the conduct described in Section 6023(A) to meet the Act's definition of trafficking. 22 U.S.C. § 6023(13)(A). Section 6023(9) defines "knowingly" as "with knowledge or having reason to know." 22 U.S.C. § 6023(9).[21] Plaintiff's pleading requirements are governed by Fed. R. Civ. P. 9(b), which provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Accordingly, the FAC "is allowed to contain general allegations as to [Defendants'] knowledge." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (internal citations and quotation marks omitted). Still, Plaintiff is "required to include allegations of the facts or events they claim give rise to an inference of knowledge." *Id.*; *accord Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015) ("Rule 8's plausibility standard applies to pleading intent."). The parties make various arguments regarding whether the facts alleged in the FAC adequately plead scienter, but one set of allegations alone suffices to plead scienter at this stage: Defendant's multiple shipments to the Port of Mariel after receiving notice that the Port was allegedly built on confiscated land.

---

the west side of [Mariel] Bay," her claims that were predicated on the 1955 concession failed. *De Fernandez*, 2022 WL 3577078 at *13. Because Plaintiffs sufficiently allege that Defendants trafficked in the confiscated land on the west side of the bay, the issue of whether Defendants also trafficked in the 1955 Concession does not affect the outcome of this motion. Moreover, the extent to which Plaintiffs' claims are only predicated on the Cuban government's confiscation of the Concession, rather than other land, will require further factual development. Accordingly, the Court declines to address at this stage whether Defendants trafficked in the 1955 Concession, or the concomitant collateral-estoppel question. *See In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 598 (S.D.N.Y. 2011) (declining to address additional issues where others were dispositive); *City of Livonia Employees' Ret. Sys. v. Wyeth*, No. 07 CIV. 10329 (RJS), 2010 WL 11906864, at *1 (S.D.N.Y. Nov. 22, 2010) (declining to "address questions of fact as part of Defendants' motion to dismiss").

[21] The Act does not define "intentionally." The Court therefore assumes the standard meaning of "intentionally" in such contexts. As the Second Circuit has explained, "intentionally" generally means that a defendant's conduct is "the product of defendant's conscious objective rather than the product of a mistake or an accident." *United States v. Townsend*, 987 F.2d 927, 930 (2d Cir. 1993).

Plaintiff's claim cannot be dismissed for lack of scienter because, as Defendants concede, they made at least two shipments to the Port of Mariel after receiving a letter from Plaintiffs alleging that the port was built on confiscated property. Mem. at 38; FAC ¶ 166. "Several judicial decisions have held that the Act's scienter requirement is satisfied when a defendant receives a demand letter putting it on notice of its alleged Helms-Burton Act violation but nevertheless continues its course of conduct after the end of a thirty-day notice period." *Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc. v. Société Générale, S.A.*, 577 F. Supp. 3d 295, 312 (S.D.N.Y. 2021) (gathering cases). On June 7, 2021, Defendants received letters from Plaintiffs stating that Defendants were "trafficking in confiscated property as defined in the Helms-Burton Act." FAC ¶¶ 166–68.[22] Defendants note that "MSC Cargo promptly instructed its subsidiaries to end its service offerings to Cuba" upon receiving the letters, Mem. at 38; *see* FAC ¶ 171 (response letter from Defendants stating that they "promptly instructed that all services offered in relation to the alleged Confiscated Property . . . must cease with immediate effect"), but Defendants do not dispute that they called at the Port of Mariel at least twice after receiving the notice letter. Mem. at 38; Reply at 20; FAC ¶¶ 143(j), 144, 166. Defendants argue only that their shipments were already "weeks underway when MSC Cargo received notice." Reply at 20. But Defendants could have turned those ships around instead of letting them dock, unload their cargo, and otherwise benefit from the port facilities on the confiscated land.[23] Defendants' choice not to, at this stage, suffices to plead scienter, "at least for the post-notice

---

[22] The parties dispute various factual assertions regarding the post-notice shipments made in a declaration attached to Defendants' motion to dismiss. Sanford Decl. ¶¶ 29–33; Mem. at 38–39; Opp. at 42–43. That affirmation may be considered when determining personal jurisdiction, but it is not properly considered in determining whether Plaintiffs state a claim. *See, e.g.*, *Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 344–45 (S.D.N.Y. 2020), *aff'd*, No. 20-3344, 2022 WL 274507 (2d Cir. Jan. 31, 2022). The Court does not consider the affirmation, or the arguments that rely on it, for the purposes of this scienter analysis.

[23] While it may be reasonable to infer, as Defendants imply, that calling at the Port of Mariel was a mistake or accident because the shipments were already underway, Reply at 20, it is also reasonable to infer that Defendants' decisions not to turn those ships around were well-informed and intentional, especially given Defendants' size and sophistication, *see, e.g.*, FAC ¶ 29 ("MSC [Cargo] is the largest shipping company in the world."). At this stage, the Court "draw[s] all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The latter inference therefore prevails at this stage.

period."[24]  *Glen*, 529 F. Supp. 3d at 332 (refusing to dismiss Title III claims on scienter grounds

where defendants allegedly continued trafficking after receiving notice); *see also de Fernandez*, 2021

WL 3173213, at *8 (finding that scienter was adequately pleaded where defendant allegedly

"continued to traffic in the Confiscated Property . . . after it received Plaintiff's pre-suit notice

letter," "at the very least for the post-notice period").

> ### v.  The Act's "Lawful Travel" Exception is an Affirmative Defense, and That Defense Fails at This Stage

Finally, Defendants' argument that their shipments to the Port of Mariel fell within the

Helms-Burton Act's "lawful travel" exception fails, as that exception provides an affirmative defense

and it is not clear from the face of the FAC that the exception applies.  "An affirmative defense is

defined as a defendant's assertion raising new facts and arguments that, if true, will defeat the

plaintiff's . . . claim, even if all allegations in the complaint are true."  *Saks v. Franklin Covey Co.*, 316

F.3d 337, 349 (2d Cir. 2003).  "[A]n affirmative defense is traditionally one that a defendant would

have the burden not only of pleading but also of proving."  *Walker v. Schult*, 45 F.4th 598, 616 (2d

Cir. 2022).  "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face

of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims

are barred as a matter of law.'"  *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 150 (2d Cir.

2024) (quoting *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015)).

The "touchstone" for "determining the burden of proof under a statutory cause of action

. . . is, of course, the statute."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005).  "The burden of

proof as to a given issue is normally placed on the party who has an affirmative goal and

presumptive access to proof."  *Walker*, 45 F.4th at 616; *see also Schaffer*, 546 U.S. at 60 (explaining that

courts will "not place the burden upon a litigant of establishing facts peculiarly within the knowledge

---

[24] Plaintiff alleges that there are more post-notice shipments than just the two specifically identified.  FAC ¶ 172 ("[Defendants] have continued to traffic since they received the Notice Letter.").

of his adversary"). "[T]he ordinary default rule" is that "plaintiffs bear the risk of failing to prove

their claims." *Schaffer*, 546 U.S. at 56. However, the burden is properly placed on the defendant

when elements of a statutory claim "can fairly be characterized as affirmative defenses or

exemptions." *Id.* at 57. For example, a statutory element that "exempt[s] otherwise illegal conduct

by reference to a further item of proof . . . creat[es] a defense for which the burden of persuasion

falls on the one who claims its benefits," normally the defendant. *Meacham v. Knolls Atomic Power*

*Lab'y*, 554 U.S. 84, 93 (2008) (internal quotation marks and citation omitted).

      Under these standards, the Helms-Burton Act's "lawful travel" exception is best read as an

affirmative defense. The exception is found in Section 6023(13)(B), which excepts specific conduct

from the definition of trafficking provided in Section 6023(13)(A). Section 6023(13) provides, in

full:

> **(13) Traffics**
>
> > **(A)** As used in subchapter III, and except as provided in subparagraph (B), a person "traffics" in confiscated property if that person knowingly and intentionally—
> >
> > > **(i)** sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
> > > **(ii)** engages in a commercial activity using or otherwise benefiting from confiscated property, or
> > > **(iii)** causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,
> >
> > without the authorization of any United States national who holds a claim to the property.
>
> > **(B)** The term "traffics" does not include—
> >
> > > **(i)** the delivery of international telecommunication signals to Cuba;
> > > **(ii)** the trading or holding of securities publicly traded or held, unless the trading is with or by a person determined by the Secretary of the Treasury to be a specially designated national;
> > > **(iii)** transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel; or

> **(iv)** transactions and uses of property by a person who is both a citizen of Cuba and a resident of Cuba, and who is not an official of the Cuban Government or the ruling political party in Cuba.

22 U.S.C. § 6023(13). So, Section 6023(13)(A) defines the conduct that constitutes trafficking, "except as provided in subparagraph (B)." Subparagraph (B), in turn, provides four categories of conduct that "[t]he term 'traffics' does not include." The "lawful travel" exception is the third such category. It excepts from trafficking "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel." 22 U.S.C. § 6023(13)(B)(iii).

The "lawful travel" exception has all the hallmarks of an affirmative defense. It provides an exception to "otherwise illegal conduct," *Meacham*, 554 U.S. at 93, in this case, an exception to conduct that constitutes trafficking. 22 U.S.C. § 6023(13)(A). That exception calls for "further item[s] of proof," *Meacham*, 554 U.S. at 93, in this case, proof that the defendant's conduct was "incident" and "necessary" to travel that was "lawful." 22 U.S.C. § 6023(13)(B)(iii). And those items of proof will almost always fall "peculiarly within the knowledge of" the defendant, *Schaffer*, 546 U.S. at 60, because the relevant travel is the defendant's, not the plaintiff's. The Court therefore concludes that the Helms-Burton Act's "lawful travel" exception is an affirmative defense that "must be established by [Defendants], not negated by Plaintiff." *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d at 1286–87 (concluding that the "lawful travel" exception is an affirmative defense).

Because it raises an affirmative defense, Defendants' lawful-travel argument fails at this stage because it is not clear from the face of the FAC that the "lawful travel" exception applies. *Michael Greco Prods.*, 112 F.4th at 150. Defendants argue that it is clear from the pleadings[25] that the two

---

[25] Defendants' argument relies, in part, on the bills of lading governing these shipments, which were attached as exhibits to the original complaint, Dkt. Nos. 1-7 & 1-8, but not the FAC. Exhibits attached to the original complaint are properly considered on a motion to dismiss, "even though the Amended Complaint is the operative pleading." *Poindexter*, 2012 WL 1027639, at *2.

post-notice shipments fall under the lawful-travel exception[26] because the shipments "strictly complied" with "a set of travel-related activities authorized by [the Bureau of Industry and Security ("BIS")] and [the Office of Foreign Assets Control ("OFAC")]."  Mem. at 40.  They argue that BIS and OFAC regulations authorize "the export of agricultural commodities to Cuba," *id.* (quoting 15 C.F.R. § 740.18(a) (2022)), and that the two post-notice shipments were exclusively of qualifying agricultural commodities, *id.* (noting that the first shipment contained "several hundred cases of wine") (citing 15 C.F.R. § 772.1 (2022) ("Agricultural commodities include . . . wine and spirits."))); *id.* at 40–41 (noting that the second shipment contained "various foodstuffs" (citing 15 C.F.R. § 772.1 ("Agricultural commodities include food (including processed food).")))  But even assuming, without deciding, that compliance with 15 C.F.R. § 740.18(a) would suffice to establish a lawful-travel defense under Section 6023(13)(B)(iii), it is not clear from the face of the pleadings that Defendants complied with those regulations.  15 C.F.R. § 740.18(a) "permits the export of agricultural commodities to Cuba . . . provided [the] transaction meets *all* of the" five criteria set forth in the regulation.  15 C.F.R. § 740.18(a) (emphasis in original).  One of the required criteria is that Defendants "notify BIS prior to exporting . . . according to the procedures set forth in [15 C.F.R. § 740.18(c)]."  15 C.F.R. § 740.18(a)(5).  Nothing in the FAC or the two shipments' bills of lading suggests that Defendants notified BIS of the shipments.  *See* FAC ¶¶ 143(j), 144; Dkt. No. 1-7; Dkt. No. 1-8.  Because it is not clear from the pleadings that Defendants complied with 15 C.F.R. § 740.18(a), their lawful-travel defense fails at this stage.

Accordingly, Ms. de Fernandez has adequately pleaded a claim under the Helms-Burton Act.

---

[26] Defendants do not argue that any shipments beside the two post-notice shipments fell within the "lawful travel" exception.  Mem. at 39–41; Reply at 20–21.  Because Defendants bear the burden of proving that their conduct fell within the exception, *see Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 490 (2d Cir. 2018) (observing that "the burden [is] on the defendant" to prove "an affirmative defense"), the Court finds that, at this stage, the "lawful travel" exception does not apply to Defendants' pre-notice shipments, *see G4S Int'l Emp. Servs. (Jersey), Ltd. v. Newton-Sealey*, 975 F.3d 182, 187 (2d Cir. 2020) (affirming finding that affirmative defense failed because the defendant "failed to present sufficient evidence to prove" that the affirmative defense applied).

**IV.    CONCLUSION**

For the reasons stated herein, Defendants' motion to dismiss under Rule 12(b)(2) is

DENIED.  Defendants' motion to dismiss under Rule 12(b)(6) is DENIED with respect to Plaintiff

Odette Blanco de Fernandez, and GRANTED with respect to all other plaintiffs in this case.

SO ORDERED.

Dated:  December 9, 2024
        New York, New York

_____
GREGORY H. WOODS
United States District Judge